## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BARKAT S. HOODA, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CA No. |
| | § | |
| W.C.A. SERVICES CORPORATION | § | |
| d/b/a WCA HOSPITAL, | § | |
| BETSY T. WRIGHT, | § | |
| VIRGINIA B. CAMPION, M.D. | § | |
| TARIQ M. KHAN, M.D., and | § | |
| ROBERT L. DANIELS, M.D. | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT
### AND APPLICATION FOR INJUNCTIVE RELIEF

COMES NOW BARKAT S. HOODA, M.D. (hereinafter "Dr. Hooda" or "Plaintiff"), filing this Original Complaint and Application for Injunctive Relief, complaining of W.C.A. SERVICES CORPORATION D/B/A WCA HOSPITAL (hereinafter referred to as "WCA"), BETSY T. WRIGHT, VIRGINIA B. CAMPION, M.D., TARIQ M. KHAN, M.D., and ROBERT L. DANIELS, M.D. (herein after referred to as the "Individual Defendants"), and would respectfully show the Court as follows:

### A.     PARTIES

1.     Plaintiff Barkat S. Hooda, M.D. is an individual residing in Webster, Harris County, Texas.

2.     Defendant WCA is a corporation that is incorporated under the laws of the State of New York.  Defendant has its principal place of business at P.O. Box 41, 28 Maple Street, Jamestown, New York 14702, and does not have a registered agent for service of process in the

---

State of Texas.  Service of process on Defendant may be made according to the laws of the State of Texas by serving the Texas Secretary of State.

3.      Defendant Betsy T. Wright is an individual and the President and CEO of WCA, with her place of business located at 28 Maple Street, Jamestown, New York 14702.  Service of process on Betsy T. Wright may be made according to the laws of the State of Texas by serving the Texas Secretary of State.

4.      Defendant Virginia B. Campion, M.D. is an individual with her place of business located at 816 Fairmount Ave., WE, Jamestown, New York 14701.  Service of process on Defendant may be made according to the laws of the State of Texas by serving the Texas Secretary of State.

5.      Defendant Tariq M. Khan, M.D. is an individual with his place of business located at 1684 Foote Avenue, Jamestown, New York 14701.  Service of process on Defendant may be made according to the laws of the State of Texas by serving the Texas Secretary of State.

6.      Robert L. Daniels, M.D. is an individual with his principal place of business located at 400 Foote Avenue, Jamestown, New York 14701.  Service of process on Defendant may be made according to the laws of the State of Texas by serving the Texas Secretary of State.

**B.      JURISDICTION**

7.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332 because the Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

**C.      VENUE**

8.      Venue is proper in this district under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

9.     All conditions precedent have been performed or have occurred. FED. R. CIV. P. 9(c).

### D.     STATEMENT OF FACTS

*Introduction*

10.     This suit and request for injunction arises out of the willful and malicious acts of a hospital and individual Defendants against Plaintiff after he exposed to hospital management certain unethical and immoral conduct and practices of hospital employees and physicians.

11.     Specifically, after Dr. Hooda resigned and left the hospital, WCA launched a bogus investigation and filed a false report with the U.S. Department of Health and Human Services National Practitioner Data Bank ("NPDB") about Dr. Hooda after Dr. Hooda expressed concerns with hospital management about WCA not having the proper facilities and staff to deliver and care for high-risk and premature infants.

12.     Dr. Hooda was unaware of both the investigation and report until informed by his new employer, University of Texas Medical Branch School of Medicine, months later.

13.     As a result of WCA's and the Individual Defendants' willful and malicious conduct, Dr. Hooda's reputation has been damaged, as well as current and future employment prospects as a physician.

14.     As long as the false report remains on file with the NPDB, Dr. Hooda cannot obtain a permanent medical license in Texas or any other state, he faces termination from his current employment, and will be unable to practice medicine in the United States.

*Background*

15.     Dr. Hooda received his medical degree in Pakistan, and completed his residency in the Department of Pediatrics at the University of Florida in 1996.

16.     He completed a three-year fellowship at Brown University in Pediatric Hematology Oncology in 1999.

17.     Dr. Hooda then became a fellow in Neuro-Oncology at New York University.

18.     He has been practicing in the U.S. since 1993 and as a pediatrician since 1996.

19.     WCA is a hospital based in Jamestown, New York.  WCA offers OBGYN care, and its OBGYN staff regularly delivers newborns at their facility.

20.     Dr. Hooda was employed by Southern Tier Pediatrics clinic in Jamestown, New York as a General Pediatrician from October 2009, until his resignation on or about May 3, 2010.

21.     Dr. Hooda was dual American Board Certified in General Pediatrics and Pediatric Hematology Oncology prior to starting with Southern Tier Pediatrics as a general pediatrician.

22.     Throughout his employment with Southern Tier Pediatrics, Dr. Hooda was an Associate Member of the WCA medical staff, having active clinical privileges in the Department of General Pediatrics, with full admitting privileges for the patients seen in the clinics.

23.     Dr. Hooda does not have a valid Neonatal Advance Life Support (NALS) certification, nor did Southern Tier Pediatrics hire him as a neonatologist.

24.     Dr. Hooda is highly trained in general pediatrics; however, delivery and resuscitation of babies, especially high-risk newborns requiring intubations and other advanced procedures, are generally performed by neonatology trained pediatric physicians.

25.     Rather, Dr. Hooda is trained to treat and care for malignant and non malignant diseases of infancy and childhood from birth onward.

26.     As such, he has extensive knowledge about the staffing and infrastructure that is standard for proper care of newborns, high-risk or not.

27.     Dr. Hooda resigned from Southern Tier Pediatrics after a rather short stay because he felt that its affiliation with WCA's practice of delivering extremely premature infants and super high-risk full-term infants was unethical and against the best interest of those babies.

28.     Specifically, the Neonatal Intensive Care Unit ("NICU") and neonatologists were not available on site; and while WCA did have a Level I Nursery, it was not sufficiently equipped with the proper infrastructure, neonatologist personnel, and appropriately trained and certified support staff competent in neonatal CPR.

29.     During the time Dr. Hooda worked at WCA, WCA and some of their Obstetricians demonstrated a pattern of opting to deliver and care for premature/high-risk infants in house rather than promptly referring or transferring them to the appropriate tertiary hospital or facility.

30.     On information and belief, WCA retained premature and high-risk infants because of the substantial revenue gains associated with treating sick babies in their own facility.

31.     It is not unusual for a premature or special need newborn to require sophisticated procedures and minute-to-minute monitoring.

32.     The costs of such procedures, monitoring, and the protracted hospital stay related to this kind of treatment are considerable.

33.     Dr. Hooda believed WCA's practices were wrong and would jeopardize the care provided in their nursery to high risk newborns and premature babies with suboptimal resources, and that was the major reason for my resignation.

34.     After giving notice of his resignation, Dr. Hooda continued his contractually mandated duties with Southern Tier Pediatrics for the notice period of approximately four weeks.

35.     During this time, Dr. Hooda had some additional unpleasant experiences that ultimately compelled him to notify hospital management.

36.     For example, he was assigned new patients despite WCA's clear understanding that he was leaving the hospital after the notice period of four weeks.

37.     Assigning a physician who will not be available to the patient for the full and long term of care is not in the best interest of the child patient from a continuity of care standpoint.

38.     This troubled Dr. Hooda, just as all the incidents substandard care he witnessed had throughout the time he worked at WCA.

39.     But a signature disturbing event that Dr. Hooda witnessed at WCA would become the basis for this entire dispute.

### The Event

40.     On the afternoon of June 2, 2010, Dr. Hooda was attending to his usual duties for Southern Tier Pediatrics when the WCA operator and NICU nurse called Dr. Hooda to assist with the delivery of a very premature baby in the operating room ("OR").

41.     The callers did not provide any further details; however, it was clear from the nature of the call that intubation would likely be necessary following the delivery.

42.     Dr. Hooda proceeded to the OR at WCA just before 1:00 PM on June 2, 2010.

43.     Upon arriving, he went directly to the VP Administrator and notified him of the extremely high-risk premature delivery in the OR, and requested his assistance in getting qualified personnel for the intubation procedure.

44.     Although WCA called Dr. Hooda to attend the delivery of a highly premature baby that would require intubation, Dr. Hooda did not have privileges to perform and intubation.

45.     Dr. Hooda entered the mother's room at approximately 1:05 PM and personally took the mother's history and spoke to the father.

46.     Also present in the room were Dr. Robert Daniels, the attending WCA staff OBGYN, and Dr. Tariq M. Khan, Dr. Hooda's superior at Southern Tier Pediatrics[1].

47.     For the first time, Dr. Hooda learned that the gestation of the young mother was twenty-two weeks; she had a prolonged rupture of the membrane for more than seven days; and the mother's vaginal swab was positive for Group B Strep.

48.     This was an extremely high-risk delivery, one for which Dr. Hooda believed WCA was ill equipped to provide proper treatment.

49.     Dr. Hooda asked Dr. Daniels to transfer the procedure to a proper facility, but Dr. Daniels refused.

50.     The doctors clearly indicated to the parents that the baby's chances for survival were extremely poor.

51.     Dr. Daniels then initiated delivery procedures.

52.     Dr. Hooda documented the pre-delivery encounter with the parents in the "Mother's Chart" between 1:12 PM and 1:16 PM on June 2, 2010.

53.     The baby was delivered still at 1:16 PM and taken to the OR from the mother's room.

54.     Dr. Khan attempted intubation three separate times without success while CPR was being administered.

---

[1]     At the time of the delivery, Dr. Daniels was on probation with the New York State Board for Professional Misconduct, and faced losing his medical license if he committed one more act of misconduct.  (*See* **Exhibit "A"**). NYSBPC required Dr. Daniels to be supervised during each delivery.

55.     Dr. Hooda did not hear any heart beat at any time during post-delivery through umbilical cord palpation or auscultation.

56.     The team abandoned CPR at approximately 1:30 PM after failing to revive the baby via three rounds of drug administration.

57.     Dr. Khan and Dr. Hooda returned to the mother's room, where they informed the mother that the baby could not be revived.

58.     Dr. Hooda wrote a post-delivery note in the mother's chart around 1:32 PM on June 2, 2010.

59.     Dr. Hooda noted that he was not properly notified before the delivery because he did not learn the true nature of the mother's and child's condition until he arrived in the mother's room just minutes before the birth.

60.     Dr. Hooda also wrote a note in the mother's chart stating that the WCA was not a suitable facility for delivery of a high-risk child like this one, and that Dr. Daniels should have transferred this case to a suitable facility once is was established that the mother had a prolonged rupture of membranes (for over 18 hours).   Instead, Dr. Daniels continued to keep the patient under his care for over a week.   Dr. Hooda also noted in the chart that Dr. Daniels and his staff refused his request to transfer.

61.     Dr. Khan then asked him to return to the Southern Tier Pediatric clinic to clear the backlog of patients while Dr. Khan stayed back at WCA.

62.     Dr. Khan entered Dr. Hooda's room at the clinic at approximately 2:15 PM and berated him for the two separate notes he had written in the mother's chart before and after delivery.

63.     Dr. Khan used a four-letter word and told Dr. Hooda that Dr. Daniels was extremely upset with Dr. Hooda's documentation of the mother's maternal history.

64.     Dr. Khan said Dr. Daniels would be calling any time to straighten Dr. Hooda out.

65.     Dr. Daniels called Dr. Hooda the next day, June 3, 2010, and berated Dr. Hooda.

66.     Later that day at WCA, Dr. Hooda noticed Dr. Daniels carrying the mother's chart as he was performing D&C/s on the mother, who had been bleeding intermittently post-delivery as per his own verbal report.

67.     Dr. Hooda subsequently found his hand-written pre and post-delivery notes lying in the WCA nursery (where no records are kept/stored), and they were separated from the rest of the mother's entire chart.

68.     On June 3, 2010, approximately one week prior to his last day at WCA and Southern Tier Pediatrics, Dr. Hooda sent an email to WCA President and Chief Executive Officer, Betsy T. Wright.

69.     In this email, Dr. Hooda explained that he felt compelled to inform WCA management of the sort of substandard medical care the hospital was administering.

70.     He also explained that he had decided to resign because of WCA's practices, and that the previous day's events represented a perfect example of the unethical conduct that had driven Dr. Hooda to look for another job some months earlier.

71.     Rather than investigating the matter, WCA, Dr. Daniels, and Dr. Kahn took a defensive stance.

*WCA's Threats*

72.     On June 4, 2010, the day after Dr. Hooda sent his email to Betsy T. Wright, Dr. Daniels called Dr. Hooda and threatened him.  He made direct threats such as, "you will pay for it soon."

73.     On June 11, 2010, Dr. Khan approached Dr. Hooda in person and threatened him, saying, "you will surface somewhere in the United States.  We will get you wherever you will be, and we have the means to do so."

74.     Also on June 11, 2010, WCA President and CEO, Betsy Wright, threatened Dr. Hooda during a telephone conversation by stating, "we will finish your medical career in the United States."

75.     On information and belief, obstetrics/gynecology is WCA's major revenue source.

76.     The chief of the OBGYN department, Dr. Thomas Andrews, resigned during the same period of time that Dr. Hooda left New York.

77.     Dr. Daniels, also a member of the OBGYN staff, was on suspension with the New York State Department of Health for professional misconduct at the time Dr. Hooda complained to WCA.  (*See* **Exhibit "A"**)

78.     Dr. Daniels faced losing his medical license if he committed one more act of professional misconduct.

79.     The loss of another doctor would have left the OBGYN department at WCA understaffed with only three doctors.

80.     On information and belief, WCA sought to protect both its reputation and primary source of revenue by threatening Dr. Hooda's career for the purpose of preventing him from reporting WCA to state authorities.

*The Follow-Through*

81.     Dr. Hooda resigned from Southern Tier Pediatrics on or about May 3, 2010 and gave notice to WCA of the same on or about May 11, 2010.

82.     Dr. Virginia B. Campion, the departmental chair of pediatrics at WCA, read Dr. Hooda's resignation during a departmental meeting on May 11, 2010.

83.     Dr. Hooda worked his last day at Southern Tier Pediatrics on June 11, 2010.

84.     He moved to Texas on June 14, and passed the Texas Physician Jurisprudence Examination on June 28, 2010.

85.     Thereafter, he started working full time as an associate professor of Pediatric Hematology Oncology at University of Texas Medical Branch School of Medicine ("UTMB"), under a temporary faculty medical license.

86.     Per his new job requirements, Dr. Hooda began the process of obtaining his permanent Texas medical license.

87.     To his knowledge, no adverse reports about Dr. Hooda were on file with the NPDB at that time.

88.     On August 26, 2010, WCA followed through on its threats by filing a false and disparaging report with the NPDB about Dr. Hooda and his competency as a physician.

89.     The NPDB was established by Congress to act primarily as an alert or flagging system intended to facilitate a comprehensive review of the professional credentials of health care practitioners, providers, and suppliers.

90.     It is intended to improve the quality of health care be encouraging State licensing boards, hospitals, professional societies, and other health care organizations to identify and discipline those who engage in unprofessional behavior; to report medical malpractice payments; and to restrict the ability of incompetent physicians, dentists, and other health care practitioners to move from state to state without disclosure or discovery of previous medical malpractice payment and adverse action history.

91.     Thus, by filing an adverse report against Dr. Hooda, WCA damaged Dr. Hooda's reputation wherever he moved in the U.S., which is precisely what WCA and the Individual Defendants had threatened to do.

92.     The report WCA filed with the NPDB falsely stated that Dr. Hooda had failed to answer the call to attend the June 2, 2010 delivery described above.

93.     The report further alleged that WCA launched an internal investigation of the matter and took action by terminating Dr. Hooda's privileges for his alleged failure to attend the delivery.

94.     At no time did WCA inform Dr. Hooda it was initiating an investigation, nor did it take any action against him while he was working at the hospital.

95.     Indeed, Dr. Hooda had no knowledge of the NPDB report until his superiors at UTMB notified him in writing in September 2010.

96.     WCA's report to the NPDB is a complete fabrication calculated to destroy Dr. Hooda's reputation and career, while protecting WCA's own financial interests.

97.     As stated, Dr. Hooda left WCA and Southern Tier Pediatrics on his own accord.

98.     He felt he could no longer work for health care providers who handled cases for which they were unequipped, and who chose financial interests over the interests of its patients.

99.     Therefore, Dr. Hooda began to explore other employment opportunities.

100.    On March 1, 2010, Dr. Hooda interviewed for the associate professor position at UTMB, and received an offer of employment.

101.    He accepted UTMB's offer, in writing, on March 16, 2010, and the Dean of UTMB ratified the offer on April 27, 2010.

102.    Dr. Hooda accepted the new job at UTMB and planned to leave WCA over ten weeks before his alleged failure to attend the delivery and WCA's alleged termination of his privileges.

103.    Dr. Hooda's contract with Southern Tier Pediatrics contained a clause allowing him to leave the practice at any time for any reason.

104.    Thus, Dr. Hooda's alleged failure to assist with the delivery, in truth, had nothing to do with his departure from WCA, Southern Tier Pediatrics, or Jamestown.

105.    Furthermore, WCA filed the report with the NPDB approximately two months after his alleged "no-show," and after he moved to Texas to begin his new job at UTMB.

### *The Result*

106.    Despite such blatant fabrications on the part of WCA, Dr. Hooda has suffered, and will continue to suffer, damages as a result of the mere existence of the report on his record.

107.    First, any health care provider can log on to the NPDB website and see that Dr. Hooda has a negative report on his record, adversely affecting his employability and application for privileges.

108.    Second, UTMB policy requires that Dr. Hooda obtain his permanent Texas medical license.

109.   Dr. Hooda's application for a Texas medical license will be denied as long as the report exists on his record.

110.   This will ultimately result in Dr. Hooda's imminent discharge from UTMB.

111.   UTMB cannot bill for services he performs for them with a temporary faculty license.

112.   Without a permanent license, Dr. Hooda cannot continue to work at UTMB or obtain employment at a physician anywhere else in the United States.

113.   However, in light of the benefits Dr. Hooda bestows upon UTMB, his superiors at UTMB agreed to contact WCA to investigate the allegations in the NPDB report, while Dr. Hooda attempts to clear the matter.

114.   A teleconference was arranged with WCA management, UTMB, and Dr. Hooda on September 29, 2010 to discuss the allegations against Dr. Hooda.

115.   Dr. Virginia B. Campion represented WCA in the teleconference.

116.   At some point during the conversation, Dr. Virginia B. Campion admitted that she had seen Dr. Hooda's notes in the mother's medical chart from the June 2, 2010 delivery, and acknowledged that Dr. Hooda was present on that date to assist with the delivery.

117.   Dr. Hooda's superior at UTMB was present to hear Dr. Virginia B. Campion's statement during the teleconference.

118.   At the conclusion of the statement, and after a pregnant pause, WCA terminated the teleconference.

119.   This admission by Dr. Campion proves that WCA knowingly filed a false report with the NPDB and has refused to void or withdraw it.

120.   For this reason, and for all reasons shown above, Dr. Hooda files this Original Complaint for money damages and injunctive relief and would respectfully show the Court the following:

121.   As a direct and proximate cause of WCA's conduct and the Individual Defendants' conduct, Plaintiff has suffered, and continues to suffer, emotional distress.

122.   As a direct and proximate cause of WCA's conduct and the Individual Defendants' conduct, Plaintiff has suffered, and continues to suffer, humiliation.

123.   As a direct and proximate cause of WCA's conduct and the Individual Defendants' conduct, Plaintiff has suffered, and continues to suffer, diminished reputation in the medical community and the community as a whole.

124.   As a direct and proximate cause of WCA's conduct and the Individual Defendant's conduct, Plaintiff has suffered, and will continue to suffer, loss of current and prospective business opportunities.

### E.   COUNT ONE – DEFAMATION AS TO WCA

125.   Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

126.   Defendant WCA is liable under the theory of libel pursuant to § 73.001 of the Texas Civil Practice and Remedies Code.

127.   Defendant WCA at all times material hereto made objectively verifiable statements and assertions, in written form, about Plaintiff personally and Plaintiff's abilities and competency as a medical doctor.

128.    WCA published the statements about Plaintiff by filing a written report with the U.S. Department of Health NPDB, a third party.

129.    The statements WCA made about Plaintiff were defamatory because WCA filed the statements with the U.S. Department of Health NPDB, resulting in an invasion of Plaintiff's personal interest in his reputation and good name.

130.    The statements WCA made in its report to the NPDB about Plaintiff were false.

131.    WCA at all times material hereto intentionally and maliciously sought to destroy the reputation of Plaintiff by publishing false accusations about Plaintiff's abilities and competency as a medical doctor, and that WCA had to terminate his privileges; or, in the alternative, WCA acted with wanton disregard, recklessness, or negligence with regard to investigating the truth and/or verifying the statements contained in WCA's report to the NPDB.

132.    As a result of the defamatory statements WCA made about Plaintiff, Plaintiff has suffered, and will in all likelihood continue to suffer, diminished reputation in the medical community and community as a whole, loss of business prospects, loss of income, personal humiliation, and emotional distress.

### F.    COUNT TWO – TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS AS TO ALL DEFENDANTS

133.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

134.    Defendants' intentional, willful, and malicious conduct caused a substantial interference with Plaintiff's relations with his current employer, UTMB.

135.    Plaintiff has a continuing business relationship with UTMB that does not amount to a formal contract.

136. After threatening Plaintiff they would do so, Defendants intentionally interfered with Plaintiff's business relationship with UTMB by filing the defamatory report with the NPDB.

137. The false statements contained in the report jeopardize Plaintiff's future with UTMB and any and all other future employment prospects in the United States.

138. Specifically, the defamatory report precludes Plaintiff from obtaining a medical license in Texas or any other state.

139. Plaintiff cannot bill for services at UTMB without a Texas medical license, which destroys the entire purpose of his employment with UTMB, and will ultimately result in his imminent termination.

140. Defendants had actual knowledge of Plaintiff's business relationship with UTMB, through written correspondence and verbal conversations between Plaintiff and Defendants.

141. The interference was not an incidental result of Defendants' conduct; rather, Defendants actively sought to interfere with and destroy Plaintiff's business relationship with UTMB.

142. Defendants' conduct was independently tortious because Defendants' conduct is actionable under recognized torts, including defamation and negligence.

143. Defendants' conduct proximately caused Plaintiff's injury.

144. Defendants' intentional interference caused actual damage to Plaintiff.

145. The defamatory report Defendant filed with the NPDB has prevented Plaintiff from applying for a Texas medical license and has damaged his relationship with his current employer.

146.     Furthermore, with his smeared reputation and inability to obtain a medical license in any state, Plaintiff is essentially unemployable.

147.     Defendants' tortious and malicious actions have ensured that Plaintiff will never practice medicine in the United States again, thereby ending his career as a physician.

### G.     COUNT THREE – CONSPIRACY AS TO ALL DEFENDANTS

148.     Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

149.     Defendant WCA and the Individual Defendants are liable for civil conspiracy for plotting, planning, and agreeing to file a fraudulent report with the NPDB, and agreeing to interfere with Plaintiff's business relations.

150.     WCA and the Individual Defendants formed a combination by agreeing to carry out the common goal of destroying Plaintiff's career and reputation.

151.     The Individual Defendants, at the very least, planned, assisted, or encouraged WCA to make a false report about Plaintiff and file it with the NPDB for the purpose of carrying out WCA's and the Individual Defendant's common goal of destroying Plaintiff's career and reputation.

152.     The object of the combination was to accomplish an unlawful purpose with intent to accomplish the end result of destroying Plaintiff's reputation and business relations.

153.     The unlawful purposes WCA and the Individual Defendants sought to accomplish were fraud and interference with business relations.

154.     Defendants furthered the agreement and combination by committing the overt act of filing a false report with the NPDB.

155.    Defendants committed fraud and intentionally interfered with Plaintiff's business relations by filing a false report with the NPDB.

156.    WCA and the Individual Defendants had knowledge of the object and purpose of the conspiracy; and there was an agreement or understanding between WCA and the Individual Defendants to inflict wrong on Plaintiff.

157.    Plaintiff has suffered, and will in all likelihood continue to suffer, diminished reputation in the medical community and community as a whole, loss of business prospects, loss of income, personal humiliation, and emotional distress, as a proximate result of Defendants' wrongful acts.

## H.    COUNT FOUR – NEGLIGENCE AS TO WCA

158.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

159.    WCA owed Plaintiff a duty of reasonable care.

160.    WCA owed Plaintiff a duty to exercise care when performing an investigation, or, actually perform an investigation, to verify the facts contained in the report WCA filed with the NPDB.

161.    WCA owed Plaintiff a duty to exercise ordinary care in the factual investigation of the events that occurred on June 2, 2010, and which were related to the report Defendant filed with the NPDB.

162.    WCA had a duty to verify the facts surrounding the events that occurred on June 2, 2010, before filing a report (over two months later) with the NPDB that described such events.

163.    WCA failed to exercise ordinary care by investigating the facts surrounding the events of June 2, 2010, before filing a report that described such events.

164.    WCA breached the duties owed by it to Plaintiff, failed to exercise ordinary care, and was negligent in the following particulars, among others:

     i.  Failure to conduct an investigation of the facts surrounding the events of June 2, 2010;

     ii.  Failure to properly investigate the facts surrounding the events of June 2, 2010;

     iii.  Failure to accurately report the facts surrounding the events of June 2, 2010;

     iv.  Failure to accurately report facts about Plaintiff to the NPDB; and

     v.  Other and further particulars as will be proven at trial.

165.    Each and every one of the foregoing acts or omissions, taken singularly or in any combination, proximately caused Plaintiff's injuries and damages.

## I.    PUNITIVE DAMAGES AS TO ALL DEFENDANTS

166.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

167.    As basis for imposition of punitive damages on Defendants, Plaintiff says:

168.    The conduct of Defendants, when viewed objectively from the standpoint of Defendants at the time of its occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

169.    Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights or welfare of Plaintiff.

170.    The acts, omissions of Defendants that constituted intentional conduct or gross negligence include one or more of the following, among others:

    i.   Intentionally or maliciously making false statements about Plaintiff to the NPDB, a third party;

    ii.   Intentionally or maliciously seeking to destroy Plaintiff's business relationship with his current employer and/or all prospective future employers.

    iii.   Failure to conduct an investigation before filing a false and inaccurate report about Plaintiff with the NPDB;

    iv.   Failure to properly verify facts about Plaintiff before filing a false and inaccurate report with the NPDB;

171.    Defendants knew of the above risks associated with damaging Plaintiff's reputation and professional career as a whole, but nevertheless proceeded with conscious indifference to the rights or welfare of Plaintiff.

172.    Defendants' conduct was intentional and willful.

173.    Plaintiff's injuries were the precise injuries Defendants calculated when Defendants acted.

174.    Alternatively, and in addition to the foregoing, Defendants' conduct was of such a character and degree as to constitute gross negligence.

175.    Defendants' conduct involved such an entire want of care that would raise the belief that the acts and/or omissions complained of were the result of conscious indifference to the rights and welfare of Plaintiff.

176.    Plaintiff seeks exemplary damages caused by the intentional acts, gross negligence, fraud and/or malice of Defendants for damages and losses relating to the defamatory statements Defendants made about Plaintiff.

177.    Plaintiff's injuries resulted from Defendants' intentional acts, gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.003(a).

178.    The conduct of Defendants' actions or omissions described above, when viewed from the standpoint of Defendants at the time of the act or omission, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff.

179.    Defendants had actual, subjective awareness of the risks involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights or welfare of Plaintiff.

180.    Plaintiff intends to show that the factors the jury may consider in determining the amount of exemplary damages which should be awarded include:

    i.   the nature of the wrong committed by Defendants;

    ii.  the character of Defendants' conduct;

    iii. the degree of culpability of Defendants;

    iv.  the situation and sensibilities of the parties concerned; and

    v.   the extent to which Defendants' conduct offends a public sense
         of justice and propriety.

181.    Plaintiff also seeks unliquidated damages within the jurisdictional limits of this Court.

182.    Plaintiff's damages also include the recovery of pre and post judgment interest and costs of Court.

183.    Based on the facts stated herein, Plaintiff requests exemplary damages be awarded to Plaintiff from Defendants.

**ALTERNATIVE BASIS FOR PUNITIVE DAMAGES**

184.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

185.    As an alternative basis for imposition of punitive damages on Defendants, Plaintiff says:

186.    Plaintiff intends to prove by clear and convincing evidence that the injuries and damages suffered, more particularly set forth above, resulted from fraud, oppression or malice.

187.    Defendants intentionally misrepresented material facts known to them, concealed material facts known to them, with the intent to deprive Plaintiff of his rights.

188.    Defendants engaged in malicious conduct with conscious disregard of the rights of others, including Plaintiff.

189.    Defendants engaged in malicious conduct that subjected persons to cruel and unjust hardship with conscious disregard of their rights, including Plaintiff.

190.    Defendants knew of the probable harmful consequences of its wrongful acts, and willfully and deliberately failed to act to avoid those consequences.

## J.    DAMAGES APPLICABLE TO ALL COUNTS

191.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

192.    Plaintiff suffered, sustained and incurred, and in reasonable probability will suffer, sustain and incur, the following injuries and damages as a producing or proximate result (or both) of the conduct of Defendants.

193.    By reason of the conduct described above, Plaintiff Barkat S. Hooda, M.D., asserts a claim for all damages for mental anguish, loss of reputation, loss of earnings, loss of prospective employment, and all other damages sustained by Barkat S. Hooda, M.D.

194.    Because Defendants' wrongful conduct constitutes malicious intentional acts and/or gross negligence, Plaintiff is entitled to and therefore asserts a claim for punitive damages in an amount sufficient to punish and deter Defendants in the future.

195.    The amount of damages prayed for herein far exceeds the minimum jurisdiction of the Court.

### K.        REQUEST FOR PRELIMINARY INJUNCTION

196.    Plaintiff adopts by reference each and every paragraph of the Statement of Facts applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

197.    This request is supported by the Affidavit of Barkat S. Hooda, M.D., attached hereto as **Exhibit "B."**

198.    Plaintiff will likely suffer irreparable injury if Defendant WCA is not enjoined while this suit is pending from allowing the false report to remain on file with the NPDB. Plaintiff requests the Court order Defendant WCA to withdraw and void the false report from the NPDB, through any and all procedures mandated by the NPDB, while this action is pending.  In absence of such an order, Plaintiff's employment with UTMB will be terminated before a trial on the merits of this case can be completed.

199.    An applicant is entitled to a preliminary injunction if she can show: (1) a substantial likelihood of success on the merits of it's claim; (2) a substantial threat of irreparable injury or harm for which there is no adequate remedy at law; (3) that the threatened injury to the

applicant outweighs any harm that the injunction might cause to Defendant; and (4) that the injunction will not disserve the public interest. *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996); *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994); *Canal Auth. Of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  The decision over whether to grant or deny a preliminary injunction is within the discretion of the district court and may be reversed on appeal only for an abuse of discretion.  *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

200.   Plaintiff has a substantial chance of succeeding on the merits of this case. Plaintiff has proof, and can obtain further proof during the discovery process, that the report WCA filed with the NPDB contains false and damaging statements about Plaintiff.  Plaintiff will show by a preponderance of the evidence that he responded to WCA's request to assist with the June 2, 2010 delivery, and indeed assisted with delivering the stillborn baby.  He made notations in the patient's chart on June 2, 2010, and immediately following the delivery.  The chart showing such entries, which, in turn, proves Plaintiff responded to the request, should be in WCA's possession.   This evidence, along with any other obtainable evidence supporting Plaintiff's claims, gives Plaintiff a substantial chance of prevailing on the merits of this case.

201.   Injury to Plaintiff is imminent and irreparable because Plaintiff cannot obtain a Texas medical license while the defamatory report about him is on file with the NPDB.  This will result in Hooda's termination from his current employment at UTMB.  If Plaintiff is terminated, he will be unable to secure employment as a physician in Texas or any other state.  Thus, if WCA does not withdraw the report from the NPDB, Plaintiff will suffer irreparable damage to his reputation, current and all future prospective business relations, and ultimately face financial

ruin and the end of his career as a medical doctor.  *See Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 375 (2008).

202.    There is no adequate remedy at law available to Plaintiff because Plaintiff will suffer injury before trial on the merits can be completed.  Furthermore, and award of money damages will not address Plaintiff's immediate need to obtain his Texas medical license for the purpose of maintaining his position with UTMB.

203.    The harm faced by Plaintiff outweighs the harm that would be sustained by Defendant WCA if the preliminary injunction were granted.  Defendant WCA will suffer no significant impairment if the Court orders Defendant to withdraw the report from the NPDB, other than the loss of time it takes to perform this task.  Plaintiff, on the other hand, essentially stands to lose his professional career, and all the financial benefits associated with the same, if the report remains on file.  Thus, Plaintiff has far greater stakes in this matter than Defendant WCA, and faces far greater harm if the preliminary injunction is denied than Defendant WCA would face if the Court grants this application.

204.    The issuance of a preliminary injunction would not adversely affect the public interest.  Removal of the report will not affect public interests because the report is fraudulent.  There has never been a need to put the public on notice of Plaintiff's conduct as a physician because the statements contained in the report about Plaintiff's abilities are false.  Thus, removing the report will not put the public at risk or adversely affect it in any way.

205.    Plaintiff is willing to post a bond in the amount the Court deems appropriate and reasonable.

206.     Plaintiff respectfully requests the Court set his application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against Defendant WCA.

### L.      REQUEST FOR PERMANENT INJUNCTION

207.     Plaintiff asks the Court to set his application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against Defendant WCA.

### M.      REQUEST FOR JURY TRIAL

208.     Plaintiff demands a jury trial and tenders the appropriate fee with his Original Complaint.

### N.      PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein and upon final hearing hereof, the Court grant Plaintiff's Application for Preliminary Injunction; the Court subsequently grant Plaintiff's Request for Permanent Injunction; Plaintiff be granted Judgment against the Defendants for the damages described above; costs of Court; prejudgment interest; and post-judgment interested; and for all other relief to which Plaintiff may be justly entitled.

Respectfully submitted,


_____*/s/  W. Craft Hughes*_____

W. Craft Hughes
Attorney-in-Charge
State Bar No. 24046123
Federal Bar No. 566470
Jarrett L. Ellzey
State Bar No. 24040864
Federal Bar No. 37369
**HUGHES ELLZEY, LLP**
Galleria Tower I
2700 Post Oak Blvd., Ste. 1120
Houston, TX 77056
Phone (888) 350-3931
Fax (888) 995-3335

**COUNSEL FOR PLAINTIFF**