

**HOSPITAL**   A Health Care System Including the JONES MEMORIAL HEALTH CENTER Division

THE WOMAN'S CHRISTIAN ASSOCIATION OF JAMESTOWN, NEW YORK

August 11, 2011

Sherry Vorabhanda, M.H.A.
Dispute Resolution Manager
Compliance and Dispute Branch
Division of Practitioner Data Banks
5600 Fishers Lane, Room 8 -103
Rockville, MD 20857

| | | |
|---|---|---|
| Re: | **National Practitioner Data Bank** | |
| | **Practitioner:** | **Barkat Hooda, MD.** |
| | **Type of Report:** | **Adverse Action Report** |
| | **Date of Report:** | **August 26, 2010** |
| | **DCN:** | **5500000064046116** |
| | **Our File No.:** | **119.185** |

Dear Ms. Vorabhanda:

Please allow this to serve as WCA Hospital's submission in response to Dr. Hooda's request for a review of the above-referenced Adverse Action Report.

<u>Executive Summary</u>

Dr. Hooda is currently prosecuting a lawsuit in federal court over the Hospital's NPDB report. By way of background, Dr. Hooda was employed by Southern Tier Pediatrics. He was granted staff privileges at WCA Hospital. On June 2, 2010, the attending obstetrician requested that Dr. Hooda, who was on-call, attend to a patient who was in late second trimester premature labor. Dr. Hooda, as a pediatrician, was requested to attend the birth in the event that the baby was viable and required medical care. Dr. Hooda initially refused to attend this call, eventually arriving, but did not provide any care or treatment to his patient. Dr. Kahn, Dr. Hooda's supervising physician and employer in private practice, responded to the call and attended to Dr. Hooda's patient. The premature baby did not survive delivery.

Subsequent to this delivery, a quality assurance review was conducted at WCA Hospital that found that Dr. Hooda did not comply with the standard of care. On June 11, 2010, Dr. Hooda sent an email to the Hospital indicating that he was leaving Jamestown, NY for Texas and accelerated his surrender of staff privileges at WCA, which was tentatively scheduled for June 30, 2010. On June 14, 2010, Dr. Hooda was scheduled to meet with the Hospital's VPMA/Medical Director as part of the Q/A process, but he did not attend the meeting or contact the VPMA/Medical Director to re-schedule. Dr. Hooda left no forwarding address in Texas and

attempts by the Hospital to reach him in Texas regarding the pending Q/A investigation were unsuccessful.

The attached documents demonstrate that WCA Hospital properly submitted a report to the NPDB regarding Dr. Hooda. The hospital's mandated quality assessment committee found that Dr. Hooda did not comply with the applicable standard of care in his initial refusal to fulfill his on-call obligations on June 2, 2010 to attend the delivery of a baby delivered in the second trimester. Furthermore, the attached documents demonstrate that Dr. Hooda was aware of a pending quality assessment review of the events of June 2, 2010 and choose to terminate his affiliation with WCA Hospital without completing the Q/A review.

<u>Documents</u>

Attached are for the Secretary's consideration relative to the circumstances surrounding the adverse action report and a brief summary of each document as it relates to Dr. Hooda's challenge and the chronology of events:

1.     **May 3, 2010 E-Mail From Dr. Hooda to Betsy Wright and Marlene Garone, MD.**

This e-mail was received by President/CEO (Betsy Wright) and VPMA/Medical Director (Dr. Marlene Garone) from Dr. Hooda informing them that he was resigning his current position as General Pediatrician at Southern Tier Pediatrics. Dr. Hooda writes, "I will **continue my contractually mandated duties for STP including Level 1 Neonatology care at WCA Hospital during the notice period.**" [Emphasis added].

2.     **May 3, 2010 E-Mail From Dr. Hooda to Dr. Garone.**

This e-mail was received by VPMA/Medical Director from Dr. Hooda stating he would be with Southern Tier Pediatrics for the next "3 months or so". Dr. Hooda also writes in his email, "**My final date of departure would be mutually decided.**" [Emphasis added].

3.     **May 11, 2010   Formal Resignation Letter From Dr. Hooda.**

This letter was sent to Dr. Garone from Dr. Hooda. It states, in part: "**As per mutual understanding reached yesterday, my last day of work is anticipated to be June 30, 2010.**" [Emphasis added].

4.     **May 11, 2010 – Pediatric Care Evaluation Minutes – 5/11/10 Meeting.**

Pediatric Care Evaluation Committee accepted and forwarded letter of resignation to Credentials Committee. The Minutes state: "**Barkat Hooda, MD has submitted a letter of resignation from the WCA Hospital Medical Staff, with his last day of work anticipated to be June 30, 2010.**" [Emphasis added].

5.    June 2, 2010.

Dr. Hooda was the on call Pediatrician and was requested to attend a delivery of a 22 week gestation baby.  Dr. Hooda initially refused to attend the delivery, but eventually came in. His delayed response in attending as requested was reported to the Medical Director by OB Coordinator with a request that a Quality Review be completed.  She reported multiple attempts to reach Dr. Hooda and have him respond to the delivery as the on-call pediatrician.  The events of June 2, 2010 are also supported in the Affidavits of Donna Barber, RN and Dr. Kahn, also attached hereto.

6.    June 3, 2010 E-Mail From Dr. Hooda to Betsy Wright and Dr. Garone.

This e-mail was received by Betsy Wright and Dr. Garone stating that Dr. Hooda planned to leave Jamestown "later this month for good".  This e-mail summarized Dr. Hooda's review of the events.

7.    June 7, 2010 OB/GYN Care Evaluation Committee Meeting Minutes.

On June 7, 2010, the OB/GYN Care Evaluation Committee met to review the events and documentation of June 2, 2010.  The Chairman of Pediatrics attended the meeting as well.  The minutes state:

> **"A perinatologist at CHOB was contacted and declined transfer because the fetus was considered to be non-viable until 23 weeks gestation.  The on-call physician was called but did not respond immediately.  Therefore, a second pediatrician was called.  Both were present for the delivery."  The conclusion:  The progress note in question was factually incorrect.  CHOB was contacted when the patient was admitted and declined to accept the transfer.  Although Dr. Hooda eventually arrived, Dr. Khan performed CPR and attended to the baby and the family. Action:  VPMA/Medical Director was requested to contact Dr. Hooda to request a correction to the progress note.  The Department of Pediatrics will review the response by the on-call physician.  [Emphasis added].**

8.    Monday, June 7, 2010 Attempts to Reach Dr. Hooda By Phone.

VPMA/Medical Director attempted to contact Dr. Hooda by phone.  On Tuesday, June 8, 2010, a second call was made to Dr. Hooda's office.  Messages were left with both of these calls for Dr. Hooda to contact VPMA/Medical Director.  VPMA/Medical Director informed the President/CEO of the attempts to reach Dr. Hooda during the previous week and requested that the Credentialing Specialist (Carol Gallagher ) informed the President/CEO, if the VPMA/Medical Director was not available,  if Dr. Hooda should call or contact us so that we can inform him that a quality review is in process regarding his delayed response on June 2, 2010.

9.    June 11, 2010 E-Mail From Dr. Hooda to Carol Gallagher.

3

This e-mail was received by Credentialing Specialist stating that he would be leaving Jamestown on Sunday, June 13, 2010: **"The family has insufficient space in the temporary accommodation in the motel where we are staying since May 31, 2010. Kindly close my hospital file effective midnight of Sunday, June 13, 2010."** [Emphasis added]. The VPMA/Medical Director was not on site, and the Credentialing Specialist informed President/CEO.

**10.     June 11, 2010 Betsy Wright's Note to File Regarding Events on 6/11/10 and Note on E-Mail Received by Credentialing Specialist.**

On Friday, June 11, 2010, Credentialing Specialist informed President/CEO that Dr. Hooda sent her an e-mail. President/CEO immediately contacted Dr. Hooda by phone at 2:45 on June 11, 2010. Betsy Wright informed Dr. Hooda that a quality review was in process and that the VPMA had been attempting to reach him and that he should not leave town without completing the quality review. He was requested to meet with the VPMA/Medical Director prior to leaving Jamestown. Dr. Hooda agreed to meet with VPMA/Medical Director on June 14, 2010 at 1:30 PM. Dr. Hooda did not keep the appointment and he did not call regarding the appointment.

**11.     June 30, 2010 Quality Improvement Review Form.**

The case was reviewed on June 30, 2010 at the Pediatric Care Evaluation Committee. Request for Quality Review of Dr. Hooda's refusal to respond was completed by Chairperson of Pediatrics on July 6, 2010. QI review determined that Dr. Hooda's documentation was not appropriate and that Dr. Hooda's refusal to respond was not appropriate. The review requested that a correction of Dr. Hooda's documentation be done as well as a letter of reprimand be given to Dr. Hooda. It was also requested that the VPMA/Medical Director have a discussion with Dr. Hooda regarding his delay in response. **"Transfer of patient in labor not safe; OB communicated with Buffalo deemed mother to stay at WCA".** [Emphasis added].

**12.     July 13, 2010 Pediatric Care Evaluation Committee Minutes of July 13, 2010 & NYS Law re:  Reporting Incidents of Possible Professional Misconduct.**

Pediatric Care Evaluation Committee met and discussed the Quality Review. It was determined that since Physician was informed at the time of his appointment to WCA that there was a potential for this type of delivery at WCA and because of his initial refusal and subsequent delay in attending a high risk delivery, the standards of care and expectations of the Medical Staff of WCA were not met.

**"The physician initially responded that the patient should be transferred to a tertiary center for delivery. The situation was again explained that Women's and Children's Hospital of Buffalo had previously been contacted regarding this pending delivery and that, per protocol, pregnant patients of 22.2 weeks gestation are not transferred to deliver. Physician 1762 directed the OB Coordinator to contact his practice partner (Physician 258) to attend the delivery. Physician 258 was contacted and indicated the he would come into the hospital and directed the**

> OB Coordinator to call Physician 1762 back to advise him that his response could be perceived as abandonment. Physician 1762 was called and the message left on his voicemail when he did not answer his telephone. Approximately 3-4 minutes later, the OB Coordinator placed a third call to physician 1762. He was very upset regarding the message that had been left. Multiple attempts to contact Physician 1762 have been made to request that he addend the medical record to reflect that his comments regarding maternal care were not accurate. He has not responded and did not attend an appointment scheduled for him to meet with the Medical Director about this case. He had previously submitted a letter of resignation effective 6/30/10, however, he left in the middle of the month. Arrangements were made to cover his pediatric back up assignment."

Since Dr. Hooda did not meet with the VPMA/Medical Director as he initially agreed on June 14, 2010, the Department of Pediatrics supported Administrations review and requirement to report these events to the Office of Professional Medical Conduct.

The action requested was a letter of reprimand to be sent to the Physician. Minutes show that several attempts were made to contact Dr. Hooda requesting information on his forwarding address and phone number prior to his leaving Jamestown. Information was not forthcoming. Attempts to receive that information from Southern Tier Pediatrics were also unsuccessful in that Dr. Hooda refused to leave the forwarding information for his practice as well.

The Credentialing Specialist found Dr. Hooda's address in Texas through an internet search of the Texas Medical Board.

**13.     July 22, 2010 Certified Letter Sent to Dr. Hooda From Betsy Wright and Letter Sent from Pediatric Department Chairman to Dr. Hooda .**

This letter was sent "Certified, Return Receipt Requested" to Dr. Hooda in Texas informing him that a report to the Office of Professional Medical Conduct would be made due to his failure to complete a quality review as requested by the President/CEO and VPMA/Medical Director. The letter states:

> "I informed you of this investigation and requested that you meet with Marlene Garone, MD, VPMA/Medical Director prior to leaving Jamestown. You stated that you understood this request and agreed to the appointment on Monday, June 14, 2010 at 1:30 p.m. to meet with her.
>
> Multiple attempts have been unsuccessfully made to locate a forwarding phone number to speak with you directly regarding the next step in this investigation.
>
> I am writing to inform you that your failure to present for that appointment is consistent with the New York State definition of professional misconduct as defined by Public Health Law, Article 28, Hospitals. Therefore, WCA Hospital will be reporting this incident to the New York State Office of Professional Misconduct

(OPMC) as required by state law and they will determine if further investigation is warranted." [Emphasis added].

The letter from Dr. Campion to Dr. Hooda stated the case was reviewed and that "you did not meet the standard of care of this department in your refusal to attend the delivery for which you were the responsible pediatrician". [Emphasis added].

WCA received the letter back on August 4, 2010 with the sticker from the US Post Office stating the letter was "Refused".  Per the envelope, the first attempt to deliver the letter was on July 28, 2010.

**14.     August 26, 2010   Letter To University of the State of New York Office of the Professions Division of Professional Licensing Services With the Adverse Action Report.**

Adverse action report was submitted as per Federal Law (42 USC § 11134(b)(2).

**15.     Affidavit of Tariq Khan, MD.**

This document was submitted as part of the *Hooda v WCA, et al.* lawsuit.  Please see paragraphs 10, 13, 14, 15, 16 & 17. On the issue of responding to call, in paragraph 15, Dr. Khan affirms: "during this notice period, however, Dr. Hooda's performance deteriorated further. He would often resist taking on-call assignments, even refusing to come to work when he was on call, and would be unavailable to see patients and supervise nurse practitioners in the office when needed." [Emphasis added].  Moreover, in paragraph 16, Dr. Khan confirms that Dr. Hooda initially refused to attend call on June 2, 1010.  Dr. Khan further affirms that upon arrival at the Hospital, Dr. Hooda was too late to provide any meaningful assistance, nor was Dr. Khan fully informed about the patient or the circumstances surrounding the delivery.

**16.     May 3, 2010 Letter from Dr. Khan to Dr. Hooda.**

This letter was disclosed in the *Hooda v. WCA, et al.* lawsuit. This letter pre-dates the June 2, 1010 incident by nearly one month.  In the letter, Dr. Khan writes, "based on hospital, department of pediatrics and practice protocol, part of having an active staff assignment with the hospital includes accepting calls and treatment patients as necessary when we are on call. Not providing care to a critically ill newborn when on call could be construed as patient abandonment. Therefore, neonatal care at WCA Hospital cannot be assigned to any other physicians". [Emphasis added].

**17.     June 11, 2010 Letter From Dr. Khan to Dr. Hooda.**

This letter was disclosed in the *Hooda v WCA, et al.* lawsuit. This letter confirms that Dr. Hooda accelerated his termination date to June 13, 2010. Dr. Khan specifically states, "Your limited notice potentially jeopardizes patient care and raises ethical concerns."

**18.     Notice of Dismissal Dated June 11, 2010.**

This notice was disclosed in the *Hooda v. WCA, et al.* lawsuit. This again confirms that Dr. Hooda resigned on June 11, 2010, which was prior to his intended end date. Interestingly, Dr. Hooda refused to provide a forwarding address to Dr. Khan in Texas. WCA encountered the same problem with Dr. Hooda in trying to reach him about the QA investigation.

### 19.   Affidavit of Donna Barber, R.N.

Ms. Barber was the neonatal nurse working at WCA Hospital on June 2, 2010. Ms. Barber has personal knowledge of what transpired on June 2, 2010 regarding Dr. Hooda's initial refusal to attend the birth while he was on-call. Ms. Barber affirms in her affidavit that she contacted Dr. Hooda to request that he attend the birth and that he initially refused to attend. She also affirms that she then experienced difficulty reaching Dr. Hooda, who was unavailable by phone, and when she did reach him by phone, he became angry. Ms. Barber's affidavit affirms that Dr. Hooda provided no treatment to the deceased infant and his only participation in the infant's birth and resuscitation attempts was to check for a heartbeat after Dr. Khan's resuscitation attempt. Ms. Barber affirms that Dr. Hooda added incorrect notes in the patient's chart regarding his involvement with the patient. Her affidavit further affirms that upon arrival at the Hospital, Dr. Hooda did not go directly to the OR to treat the patient, but instead he went to the Hospital's administration department to complain.

### Conclusion

As the attachments demonstrate, WCA Hospital made the NPDB report on Dr. Hooda after careful deliberation of the events if June 2, 2010 and in good faith. The Pediatric Care Evaluation Committee found that Dr. Hooda's actions of June 2, 2010 did not meet the accepted standards of care in the community. Instead of confronting this finding, Dr. Hooda fled the state. It is evident that Dr. Hooda was aware that a Q/A investigation was pending and in an attempt to avoid that investigation, he left New York State before he was scheduled to meet with the VPMA/Medical Director on June 14, 2010.

Based upon these facts, WCA Hospital had an affirmative obligation to make the instant report to the NPDB. Accordingly, WCA requests that this review be decided in its favor and that no further action be taken.

Thank you for your attention and consideration on this review. Please contact us if you have any questions regarding this submission.

Very truly yours,

Marlene Garone, MD
VPMA/Medical Director

attachments

| | |
|---|---|
| **From:** | barkat hooda <barakathoo@gmail.com> |
| **To:** | <betsy.wright@wcahospital.org> |
| **CC:** | "marlene.garone" <marlene.garone@wcahospital.org> |
| **Date:** | 5/3/2010 12:57 PM |
| **Subject:** | RE: Resignation Letter - CONFIDENTIAL |

Dear Ms Wright:

I wish to inform you that I have resigned from my current position as General Pediatrician at STP. An official letter was submitted to Dr Khan this AM during a warm and cordial meeting.

I will continue my contractually mandated duties for STP including level I neonatology care at WCA hospital during the notice period.

I thank you very much for you support and look forward to lasting association in future.

Regards

Barkat Hooda, MD
165 Front Street
Lakewood, NY 14750

Carol Gallagher - Re: Resignation Letter - CONFIDENTIAL

From:     Marlene Garone
To:       hooda, barkat
Date:     5/4/2010 8:24:23 AM
Subject:  Re: Resignation Letter - CONFIDENTIAL
CC:       Gallagher, Carol

I wish you and your family the best.  Please inform us of the date that you and Tariq decide so that we may close your medical staff file correctly.

Thank you

>>> barkat hooda <barakathoo@gmail.com> 5/3/2010 6:02 PM >>>
Dear Dr Garone:
I regret too........In the end my wife wished that we should move closer to her mom down south.... I will be with Tariq for next 3 months or so. My final date of departure would be mutually decided. I deeply appreciate your support to date. Thank you so much for your
· ·shes.
 .rkat

On 5/3/10, Marlene Garone <Marlene.Garone@wcahospital.org> wrote:
> Dr. Hooda,
>
> I am very sorry to hear this.  I was hopeful that you and Dr. Khan
> would be able to resolve your differences.  I wish you the best in your
> next position.
>
> Sincerely,
>
>
>
> Marlene Garone, MD
> VPMA/Medical Director
> WCA Hospital
> 207 Foote Avenue - PO Box 840
   amestown, NY 14702-0840
> 716-664-8291
> marlene.garone@wcahospital.org
>
>
>>>> barkat hooda <barakathoo@gmail.com> 5/3/2010 12:55 PM >>>
>
> Dear Ms Wright:
>
> I wish to inform you that I have resigned from my current position as
> General Pediatrician at STP. An official letter was submitted to Dr
> Khan this AM during a warm and cordial meeting.
>
> I will continue my contractually mandated duties for STP including
> level I neonatology care at WCA hospital during the notice period.
>
> I thank you very much for you support and look forward to lasting
> association in future.
>
> Regards
>
> Barkat Hooda, MD
> 165 Front Street

> Lakewood, NY 14750
>
>

**From:**      Betsy Wright
**To:**        Garone, Marlene
**Date:**      5/3/2010 12:59:37 PM
**Subject:**   Fwd: RE: Resignation Letter - CONFIDENTIAL


>>> barkat hooda <barakathoo@gmail.com> 5/3/2010 12:55 PM >>>
Dear Ms Wright:

I wish to inform you that I have resigned from my current position as
General Pediatrician at STP. An official letter was submitted to Dr
Khan this AM during a warm and cordial meeting.

I will continue my contractually mandated duties for STP including
level I neonatology care at WCA hospital during the notice period.

I thank you very much for you support and look forward to lasting
association in future.

Regards

Barkat Hooda, MD
165 Front Street
Lakewood, NY 14750

3

RECEIVED
MAY 11 2010

May 11, 2010

Marlene Garone, MD

VP -Medical Affairs/Medical Director

WCA Hospital

207 Foote Avenue

Jamestown, NY 14702--0840

RE: RESIGNATION LETTER

Dear Dr. Garone:

I regret to inform you that I have resigned from my position as a General Pediatrician with Southern Tier Pediatrics. Dr Khan has graciously accepted my resignation on May 3, 2010. As per our mutual understanding reached yesterday, my last day of work is anticipated to be June 30, 2010.

In addition to other multi-factorial reasons, my wife would like us to move closer to where our in-laws currently live down south. We plan to leave Jamestown on or after June 30, 2010 post completion of the academic year at Southwestern Central School District where our kids currently study.

My family and I have enjoyed our stay in Chautauqua County and have been impressed with the hospitability and reception from the community in general.

I deeply appreciate the support I received from you and the entire team of the Department of Pediatrics at WCA hospital during my less than a year stay in Jamestown.

You all will be missed for sure once we leave.

I have accepted a position as an Associate Professor of Pediatrics in a major university system and will keep you posted with my plans in the near future.

I wish you all the best and will look forward to your continuing support in future.

Sincerely,

Barkat Hooda, MD

General Pediatrician,

Southern Tier Pediatrics

1684 Foote Ave Ext

Jamestown, 14701

Cc: Dr Tariq M Khan, President Southern Tier Pediatrics

WCA Hospital
Pediatric Care Evaluation

5/11/10          Page 1 of 1

**Meeting:**     Pediatric Care Evaluation Committee
**Date:**        May 11, 2010
**Attendance:**  On file
**Presiding:**   Virginia Campion, M.D., Chairman

I.    **Review of Minutes**

II.    **Credentialing**
    A. Barkat Hooda, MD has submitted a letter of resignation from the WCA Hospital Medical Staff, with his last day of work anticipated to be June 30, 2010.
    Recommendation/Action: Dr. Hooda's letter of resignation will be forwarded to Credentials Committee.

Respectfully submitted,

Virginia Campion, M.D.
Chairman

*Quality Assurance Material Confidentiality and Discoverability Protected by:*
*New York State Education Law 6527, New York State Public Health Law 2805M*

#5 – no attachment – information only

*6*

| | |
|---|---|
| **From:** | barkat hooda <barakathoo@gmail.com> |
| **To:** | "betsy.wright" <betsy.wright@wcahospital.org> |
| **CC:** | "marlene.garone" <marlene.garone@wcahospital.org> |
| **Date:** | 6/3/2010 8:07 AM |
| **Subject:** | RE: Moral & Ethical Dilemma - CONFIDENTIAL |

Dear Ms Wright:

You are aware that I have resigned from my employment with STP dated
May1, 2010 and a letter in this regard was also written to WCA
hospital as well. This letter of resignation was read by Dr Campion
and approved in the departmental meeting of May 11, 2010 as well. I
will leave Jamestown later this month for good.

I am in a moral or ethical dilemma on the issue of delivering
extremely premature infants/super high risk full terms at WCA hospital
when we DONOT have infrastructure (NICU), personnel (Neonatologist)
and support staff (appropriately trained, credentialled and NALS
certified with demonstrated competency in advance neonatal CPR). That
is one of the MAJOR REASON why I am leaving Jamestown.

Some funny things have started to happen after my resignation notice:

1) I have been assigned NEW PATIENTS when everybody knows that I am
leaving in less than 4 weeks and it is NOT in the best interest of the
child from the continuity of care point of view

2) My back up was OUT OF TOWN and NOT AVAILABLE on May 19, 2010 when
Dr Staria asked me to attend a C-section delivery of a growth retarded
baby weighing 2000gms approximately and expected to have respiratory
distress requiring potential INTUBATION!

3) An extremely premature non-revivable baby of less than 24 week
gestation was delivered at WCA by Dr Daniels on June 2, 2010. The
mother had prolonged rupture of membrane for more than SEVEN DAYS
along with positive swab for Group B Strep. Mr Larry Senn, VP in your
office was timely notified of this fact at 1 pm prior to the delivery
of the baby at 1.16pm.

History that I took from the mother PRIOR to the delivery (and NOT
shared by Dr Daniels), when documented in mother's chart at 1.12 pm,
resulted in harsh treatment from my employer in the office after 2 pm
and the documentation in the chart was referred to as "that_ _ _ _ ing
note in the chart". I was also told that "Be ready to receive a
straightening call from Bob Daniels anytime who is very upset with you
documentation"

Now that I am leaving this town in few days, I seek your active
support to ensure that I am not coerced or threatened into
participating in any activity at WCA hospital that I consider morally
and ethically wrong. Nobody should ever use "four lettered word
starting with f" with me in any communication! Kindly enforce the
above through WCA liaison with Obstetricians and my employer who has
lost my confidence to serve as my back after using those shameful
words yesterday

This letter is written in good faith keeping best interest of patients and the hospital in perspective. Confidentiality and whistle blower protection under prevailing law is requested.

With best regards

Barkat Hooda, MD

WCA Hospital
OB/GYN Department Care Eval

7

| Meeting: | OB/GYN Care Evaluation Committee Meeting |
|---|---|
| Date: | June 7, 2010 |
| Attendance: | On File. |
| Presiding: | B.L. Sutaria, M.D., OB/GYN Department Chairman. |

## IV. Case Reviews:

1. #000191861/326858024. Neonatal death

**Findings:** Primgravida to L & D at 22 wks gestation with PPROM. No contractions were noted. USG revealed no evidence of abruption, scant amount of amniotic fluid and estimated fetal weight of 465+/-69 grams. A perinatologist at CHOB was contacted and declined transfer because the fetus was considered to be non-viable until 23 weeks gestation. The plan was to transfer the pt to CHOB at 23 weeks. The prognosis and plan of care was explained to the pt and her husband and she was admitted for observation and IV antibiotics. Vaginal cultures were positive for Group B Strep. Five days after admission active labor ensued. The on-call pediatrician was called but did not respond immediately. Therefore, a second pediatrician was called. Both pediatricians were present for the delivery. The baby weighed 444 grams with apgars of 2/1.1 CPR was administered. The baby died shortly after delivery. Concern was expressed by one of the obstetricians regarding the response by the on-call pediatrician and the pediatric progress note. The Chairman of the Dept of Pediatrics was present during this case review.

**Conclusion:** The progress note in question was factually incorrect. CHOB was contacted when the pt was admitted and declined to accept the transfer. CHOB uses estimated gestational age, not estimated fetal weight, to determine fetal viability. A recommendation was made to add fetal viability and preterm maternal transfer clarification to the agenda for the annual CHOB perinatal review mtg. The physicians all agreed that the obstetric standards of care were followed and that obstetric management was appropriate.

**Action:** Marlene Garone, MD, VPMA/Medical Director was requested to contact the on-call pediatrician to request a correction to the progress note. The Department of Pediatrics will review the response by the on-call pediatrician.

Quality Assurance Material Confidentiality and Discoverability
Protected by NYS Education Law 6527 NYS Public Health Law 2805M

| | |
|---|---|
| **From:** | barkat hooda <barakathoo@gmail.com> |
| **To:** | Carol Gallagher <Carol.Gallagher@wcahospital.org> |
| **Date:** | 6/11/2010 12:55:14 PM |
| **Subject:** | RE: Final Departure from WCA |

Dear Carol:

This weekend will be our last weekend in Jamestown as Mehnaz wants to see her mom in Texas ASAP and the family has insufficient space in the temporary accommodation in the motel where we are staying since May 31, 2010.

Kindly close my hospital file effective midnight of Sunday June 13, 2010.

I have sent you Hospital ID badge and pager via certified mail that should reached you today. Additionally, I have signed off all pending charts as provided by Mary in the Medical Records yesterday at 7.35 AM as well.

I thank you and Dr Garone for facilitating our transition from Jamestown to Texas next week.

Regards

Barkat Hooda, MD

**CC:**       "marlene.garone" <marlene.garone@wcahospital.org>

M/6 - 720 - 3015 (cell)



**Extension Detail**

test

WCA Hospital
207 Foote Ave.  Jamestown NY 14701

Report Date: 2010-06-01 to 2010-06-30                              Print Date: 2011-07-28

Department:
COST CENTER      8810 Administration
Name:            Galaheer, Carol
Extension:       0008422                                    Email:

| Date | Time | Dir | From | To | Location | Digits | Duration | Cost | Route | Comment |
|------|------|-----|------|-----|----------|--------|----------|------|-------|---------|
| 2010/06/08 | 13:50 | Out | E0008422 | T0008038 | JAMESTOWN NY | 661-9730 | 00:04:14 | 0.00 | LOC | |
| 2010/06/08 | 13:50 | Out | E0008422 | T0008038 | JAMESTOWN NY | 661-9730 | 00:04:14 | 0.00 | LOC | |
| 2010/06/11 | 13:40 | Out | E0008422 | T0008060 | JAMESTOWN NY | 661-9730 | 00:04:24 | 0.00 | LOC | |
| 2010/06/11 | 13:40 | Out | E0008422 | T0008060 | JAMESTOWN NY | 661-9730 | 00:04:24 | 0.00 | LOC | |
| 2010/06/11 | 13:54 | Out | E0008422 | T0008061 | JAMESTOWN NY | 661-9730 | 00:00:36 | 0.00 | LOC | |
| 2010/06/11 | 13:54 | Out | E0008422 | T0008061 | JAMESTOWN NY | 661-9730 | 00:00:36 | 0.00 | LOC | |
| 2010/06/15 | 10:46 | Out | E0008422 | T0008028 | JAMESTOWN NY | 661-9730 | 00:04:26 | 0.00 | LOC | |
| 2010/06/15 | 10:46 | Out | E0008422 | T0008028 | JAMESTOWN NY | 661-9730 | 00:04:26 | 0.00 | LOC | |
| 2010/06/29 | 08:46 | Out | E0008422 | T0008052 | JAMESTOWN NY | 661-9730 | 00:00:08 | 0.00 | LOC01 | |
| 2010/06/29 | 08:46 | Out | E0008422 | T0008052 | JAMESTOWN NY | 661-9730 | 00:00:08 | 0.00 | LOC01 | |
| 2010/06/29 | 09:27 | Out | E0008422 | T0008024 | JAMESTOWN NY | 661-9730 | 00:01:18 | 0.00 | LOC | |
| 2010/06/29 | 09:27 | Out | E0008422 | T0008024 | JAMESTOWN NY | 661-9730 | 00:01:18 | 0.00 | LOC | |
| 2010/06/29 | 09:28 | Out | E0008422 | T0008057 | JAMESTOWN NY | 661-9730 | 00:00:36 | 0.00 | LOC | |
| 2010/06/29 | 09:28 | Out | E0008422 | T0008057 | JAMESTOWN NY | 661-9730 | 00:00:36 | 0.00 | LOC | |
| SUB-TOTAL | 14 | | | | | | 00:31:26 | 0.00 | | |

|                        |      |
|------------------------|------|
| Cost                   | 0.00 |
| Extension Charges      | 0.00 |
| Equipment Charges:     | 0.00 |
| Total Extension Charges | 0.00 |



**Extension Detail**

test

WCA Hospital
207 Foote Ave.  Jamestown NY 14701

Report Date: 2010-06-01 to 2010-06-30                    Print Date: 2011-07-07

Department:
COST CENTER      8610 Administration
Name:            Medical Director
Extension:       0008291                              Email:

| Date | Time | Dir | From | To | Location | Digits | Duration | Cost | Route | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010/06/07 | 15:05 | Out | E0008291 | T0008040 | JAMESTOWN NY | 661-9730 | 00:03:04 | 0.00 | LOC | ✓ |
| 2010/06/15 | 16:19 | Out | E0008291 | T0008029 | JAMESTOWN NY | 661-9730 | 00:07:26 | 0.00 | LOC | |
| SUB-TOTAL | 2 | | | | | | 00:10:30 | 0.00 | | |

Cost                    0.00

Extension Charges       0.00
Equipment Charges       0.00
Total Extension Charges 0.00

*9*

| | |
|---|---|
| **From:** | barkat hooda <barakathoo@gmail.com> |
| **To:** | Carol Gallagher <Carol.Gallagher@wcahospital.org> |
| **Date:** | 6/11/2010 12:55:14 PM |
| **Subject:** | RE: Final Departure from WCA |

Dear Carol:

This weekend will be our last weekend in Jamestown as Mehnaz wants to see her mom in Texas ASAP and the family has insufficient space in the temporary accommodation in the motel where we are staying since May 31, 2010.

Kindly close my hospital file effective midnight of Sunday June 13, 2010.

I have sent you Hospital ID badge and pager via certified mail that should reached you today. Additionally, I have signed off all pending charts as provided by Mary in the Medical Records yesterday at 7.35 AM as well.

I thank you and Dr Garone for facilitating our transition from Jamestown to Texas next week.

Regards

Barkat Hooda, MD

**CC:**          "marlene.garone" <marlene.garone@wcahosital.org>

*Ispoke w/ Dr Hooda @
2:45 on Fri 6/11/10.
He will meet with
Dr Garone at 1:30 on
Mon 6/14/10*

*Betsy Wright*

*10*

## NOTE TO HOODA FILE

On June 11, 2010, Carol Gallagher, Credentialling Specialist, came to my office shortly after 1:00 p.m. She told me that she had received an e-mail from Dr. Hooda stating that he would be leaving Jamestown that week-end and not staying through the end of the month as originally planned. She mentioned that Dr. Garone, VPMA/Medical Director, had been trying to reach Dr. Hooda and had not heard back from him.

Earlier in that week, Dr. Garone had mentioned to me that Dr. Hooda was under quality review and that she had been trying to meet with him and had not heard back after leaving several messages. I asked Carol for a phone number where I could reach Dr. Hooda. She informed me that the cell phone number we had on file was no longer working and she would try to find a number where he could be reached.

A short while later, Carol returned to my office and informed me that my phone line was on hold with Dr. Khan's office, that Dr. Hooda was working in the office and would be with me shortly.

When I spoke with Dr. Hooda, I told him that he really needed to meet with Dr. Garone, VPMA/Medical Director, because he had a case under quality review and she had been trying to set up a meeting with him. He told me that he had sent me an e-mail regarding the case he thought I must be referring to in our discussion. I told Dr. Hooda that sending an e-mail did not mean that the review was closed and that he really must meet with Dr. Garone to discuss the concerns that had been raised.

Dr. Hooda agreed to meet with Dr. Garone, in her office, at 1:30 p.m. on Monday, June 14, 2010. I left Dr. Garone a note.

On Monday, June 14, 2010 at 2:30 p.m., Dr. Garone informed me that Dr. Hooda had not arrived for the meeting.

Betsy T. Wright, FACHE
President/CEO

**HOSPITAL**
ESTOWN, NY 14702-0840          *11*
MPROVEMENT
IEW FORM                        QI1510

*Quality Assurance Material Confidentiality and Discoverability Protected by:*
*New York State Education Law 6527 / New York Public Health Law 2805M*

| Date of event: 6/2/10 | Admission date: 6/2/10 | Discharge date: 6/2/10 |
|---|---|---|

| Screen/Indicator: | 17,18  18,10 | ID # Staff/MD involved: Hooda   714 , 258 |
|---|---|---|

Reason for Review: ☐ Routine review  ☐ Complaint  ☐ Mortality  ☑ Regulatory  ☐ Hospital Acquired Condition

☐ Other (specify)  _neonatal death_

Refer to: _Peds    OB_   By: (Print name): _____   _Jac_   Date: 6/3/10

SUMMARIZE EVENT: _Vag delivery @ 22-23 wk gest. Two Peds present for_
_delivery. Apgar 2-1-1 '444 gms, eyes fused. Apneic HR < 55._
_Stimulated PPV via BMV × 20-30 sec's improvement, Intubated start_
_by Anesthesia. Epi via ETT c̄ PPV × 2 3-4 min apart s̄ improve-_
_ment Code ceased p̄ D/W parents p̄ 18 min. Blood sample for_
_Chromosomal studies + photos for genetic evaluation done._
_✓ Cynthia Noonan, RN 6/30/10_

ASSESSMENT: _Medical care appropriate. Note by Dr. Hooda not appropriate._
_Transfer of pt in labor not safe; OB communicates with Buffalo_
_deemed mother to stay at wgt. Delay in Dr Hooda to respond to on call_
_situation responsibility not appropriate. also of note_

CONCLUSION (if checking a number, only check one number):

☐  1 = Predictable or unpredictable occurrence/event with appropriate care
☐  2 = Minor with no potential for harm
☑  3 = Room for improvement*
☐  4 = Harm*

And/or, as applicable

☐  A = Documentation issue
☑  B = Process or system issue*        *Requires an action*

_Apgar at 1 min implies_
_resp effort when by notes_
_there was none_
_refered to 2B_
_nursing 7/7/10  Co_

| ACTION (completed by person responsible for follow-up) | Date completed |
|---|---|
| 1. ☐ Education (specify) | |
| 2. ☑ Discussion with provider/staff by:  _Dr. Carone._ | |
| 3. ☑ Discussion at Care Committee          _PC&C_ | 7/13/10 |
| 4. ☑ Interdepartmental discussion by:  _Peds - OB  6/7/10_ | |
| 5. ☑ Other (specify)  _letter of reprimand_ | |

Signature: _____   PRINT NAME HERE: _V. Campion_   Date: _7/6/10_

Department Head signature: _____

RETURN TO QI DEPARTMENT

WCA Hospital
Pediatric Care Evaluation

(12)

7/13/10          Page 1 of 1

**Meeting:**      Pediatric Care Evaluation Committee
**Date:**         July 13, 2010
**Attendance:**   On file
**Presiding:**    Virginia Campion, M.D., Chairman

III.   **Case Review**
  A.  Case #326885084/#900032596 was reviewed for a neonatal death and referral from an
interdepartmental discussion at the OB/GYN meeting 6/7/10.
    Findings: While preparations were being made to deliver a neonate of 22.5 weeks gestation, the on-
call Pediatrician (physician 1762) was notified by the OB Coordinator of the pending delivery, prenatal
history and the request to attend the delivery per the direction of the attending obstetrician. The
physician initially responded that the patient should be transferred to a tertiary center for delivery. The
situation was again explained, that Women and Childrens Hospital of Buffalo had previously been
contacted regarding this pending delivery and that, per protocol, pregnant patients of 22.2 weeks
gestation are not transferred to deliver. Physician 1762 directed the OB Coordinator to contact his
practice partner (physician 258) to attend the delivery. Physician 258 was contacted and indicated that
he would come into the hospital and directed the OB Coordinator to call physician 1762 back to advise
him that his response could be perceived as abandonment. Physician 1762 was called and the
message left on his voicemail when he did not answer his telephone. Approximately 3-4 minutes later
the OB Coordinator placed a third call to physician 1762. He was very upset regarding the message
that had been left. He was advised that the message was left under the direction of physician 258 and
that physician 1762 was to attend the delivery. Both physicians were present for the delivery, with
physician 258 managing the care. Physician 1762 assessed the heart rate at physician 258's request.
Inflammatory notes were subsequently made by physician 1762 regarding his perception of the
appropriate plan for delivery and that he was not advised of the patient's history.
    Discussion: The Chairman of Pediatrics attended the OB/GYN Care Evaluation Committee on 6/7/10
at the request of the obstetricians to review and discuss this case. The obstetrician followed the
appropriate protocol. Physician 1762 was made well aware at the time of his appointment to the
Medical Staff that there was a potential for this type of delivery at WCA. Multiple attempts to contact
physician 1762 have been made to request that he addend the medical record to reflect that his
comments regarding maternal care were not accurate. He has not responded and did not attend an
appointment scheduled for him to meet with the Medical Director about this case. He had previously
submitted a letter of resignation effective 6/30/10, however he left in the middle of the month.
Arrangements were made to cover his pediatric back up assignment. Further discussion was held
regarding appropriate plan of action.
    Conclusion: There was an initial refusal and subsequent delay in attending a high risk delivery. These
actions do not meet the standard of care or the expectations of the Medical Staff at WCA Hospital.
The reporting requirements under NYS law for refusal to respond were reviewed. The Department of
Pediatrics supports Administration's review and decision to report these events to OMPC.
    Action: A letter of reprimand will be sent to physician 1762.

Respectfully submitted,


Virginia Campion, M.D.
Chairman

*Quality Assurance Material Confidentiality and Discoverability Protected by:*
*New York State Education Law 6527, New York State Public Health Law 2805M*

12    OHHC

 **LexisNexis**

LEXSTAT NY PUBLIC HEALTH LAW 2803-E

NEW YORK CONSOLIDATED LAWS SERVICE
Copyright © 2010 Matthew Bender, Inc.
a member of the LexisNexis (TM) Group
All rights reserved

*** THIS SECTION IS CURRENT AS OF JUNE 8, 2010 ***
*** THROUGH RELEASED CHAPTERS 1 THROUGH 49, 52, AND 61 THROUGH 109 ***

PUBLIC HEALTH LAW
ARTICLE 28.  HOSPITALS

**Go to the New York Code Archive Directory**

NY CLS Pub Health § 2803-e  (2010)

§ 2803-e.  [n1]Reporting incidents of possible professional misconduct

1. (a) Hospitals and other facilities approved pursuant to this article shall make a report or cause a report to be made within thirty days of the occurrence of any of the following: the suspension, restriction, termination or curtailment of the training, employment, association or professional privileges or the denial of the certification of completion of training of an individual licensed pursuant to the provisions of title eight of the education law or of a medical resident with such facility for reasons related in any way to alleged mental or physical impairment, incompetence, malpractice or misconduct or impairment of patient safety or welfare; the voluntary or involuntary resignation or withdrawal of association or of privileges with such facility to avoid the imposition of disciplinary measures; or the receipt of information which indicates that any professional licensee or medical resident has been convicted of a crime; the denial of staff privileges to a physician if the reasons stated for such denial are related to alleged mental or physical impairment, incompetence, malpractice, misconduct or impairment of patient safety or welfare.

(b) Hospitals and other facilities approved pursuant to this article shall make a report or cause a report to be made within [fig 1] thirty days of obtaining knowledge of any information which reasonably appears to show that a physician is guilty of professional misconduct as defined in section sixty-five hundred thirty or sixty-five hundred thirty-one of the education law. A violation of this [fig 2] paragraph shall not be subject to the provisions of section twelve-b of this chapter.

2. Reports of possible professional misconduct made pursuant to this section shall be made in writing to the education department with respect to all individuals licensed pursuant to title eight of the education law except that such reports shall be made to the department of health in the case of physicians, physician's assistants and specialist's assistants. Written reports shall include the following information:

(a) name, address, profession and license number of the individual [fig 1] ;

(b) a description of the action taken by the hospital including the reason for the action and the date thereof, or the nature of the action or conduct which led to the resignation or withdrawal, and the date thereof, stated with sufficient

specificity to allow a reasonable person to understand which of the reasons enumerated in subdivision one of this section led to the action of the hospital or the resignation or withdrawal of the individual, and, if the reason was an act or omission of the individual, the particular act or omission;

    (c) any criminal conviction of which the hospital has knowledge [fig 1] ; and

    (d) such other information as the education department or the department of health shall require.

3. (a) Any report or information furnished to the education department or department of health in accordance with the provisions of this section shall be deemed a confidential communication and shall not be subject to inspection or disclosure in any manner except upon formal written request by a duly authorized public agency or pursuant to a judicial subpoena issued in a pending action or proceeding.

    (b) Any person, facility or corporation which makes a report pursuant to this section in good faith and without malice shall have immunity from any liability, civil or criminal, for having made such a report. For the purpose of any proceeding, civil or criminal, the good faith of any person required to make a report shall be presumed.

**HISTORY:**
    Add, L 1980, ch 866, § 15, eff Jan 1, 1981.
    Sub 1, par (a), formerly entire subdivision, so designated and amd, L 1984, ch 1005, § 10; amd, L 1985, ch 294, § 2, eff July 1, 1985.
    Sub 1, par (b), add, L 1984, ch 1005, § 10; amd, L 1991, ch 606, § 17, eff July 26, 1991 (see 1991 note below).
    Sub 1, par (b), amd, L 2000, ch 542, § 8, eff Oct 6, 2000 (see 2000 note below).
    The 2000 act deleted at fig 1 "sixty" and at fig 2 "subparagraph"
    Sub 2, amd, L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    Sub 2, opening par, formerly part of entire sub 2, so designated sub 2, opening par, L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    Sub 2, par (a), formerly part of entire sub 2, so designated sub 2, par (a) and amd, L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    The 2000 act deleted at fig 1 a comma
    Sub 2, par (b), formerly part of entire sub 2, so designated sub 2, par (b) and amd, L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    Sub 2, par (c), formerly part of entire sub 2, so designated sub 2, par (c) and amd, L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    The 2000 act deleted at fig 1 a comma
    Sub 2, par (d), formerly part of entire sub 2, so designated sub 2, par (d), L 2000, ch 542, § 9, eff Oct 6, 2000 (see 2000 note below).
    Sub 3, par (a), amd, L 1984, ch 1005, § 11, eff Jan 20, 1985.

**NOTES:**

Editor's Notes

Laws 1991, ch 606, § 32, eff July 26, 1991, provides as follows:
    § 32. This act shall take effect immediately and shall be deemed to apply to any case in which a statement of charges has not been served as of the effective date of this act pursuant to paragraph (d) of subdivision 10 of section 230 of the public health law unless the parties in a then pending case consent to proceedings under the provisions of this act, except that paragraph (j) of subdivision 10 of section 230 of the public health law, as amended by section eight of this act, shall take effect 1 year after this act becomes a law; and provided further, that the amendment made by section three

of this act to paragraph (a) of subdivision 10 of section 230 of the public health law and the amendment made by section twelve of this act to subparagraphs (ii) and (iii) of paragraph (g) of subdivision 11 of section 230 of the public health law shall not affect the expiration of certain provisions of such subdivisions as last amended by chapter 55 of the laws of 1989.


Laws 2000, ch 542, § 1, eff Oct 6, 2000, provides as follows:
   Section 1. Short title. This act shall be known and may be cited as the "patient health information and quality improvement act of 2000".


New York References:
   This section referred to in §§ 2805-j, 2805-k


NYCRR References:
   Nursing homes-continuous violation penalties. 10 NYCRR §§ 414.1 et seq
   Nursing homes-minimum standards. 10 NYCRR §§ 415.1 et seq


Research References & Practice Aids:
   76 NY Jur 2d, Malpractice § 286


Case Notes:


   Plaintiff's motion for discovery and inspection should have been denied-in underlying malpractice action, plaintiffs seek damages for personal injuries sustained by their conservatee while patient in emergency room of defendant hospital; plaintiffs contend conservatee sustained injuries because of negligent care in failing to diagnose subdural hematoma which caused quadriplegia; plaintiffs sought disclosure of statement prepared for defendant by emergency department manager and signed by nurse; emergency department manager stated statement was prepared by him as part of his employment responsibilities at defendant in accordance with quality review function and employee personnel policies and in compliance with Public Health Law § 2803-e (1) (a) and, as such, was privileged from disclosure; defendant's risk manager's duties included promptly investigating any incident which could result in malpractice claims, and she secured statements from various witnesses after incident, under direction of defendant's counsel, in anticipation of potential litigation; nurse's statement was not taken under risk manager's direction or with her knowledge; emergency department manager averred that nurse's statement was prepared by him and signed by her as part of his employment responsibilities; nurse was dismissed by defendant as result of events involving conservatee; nurse's statement was mandated by law (see, Public Health Law § 2803-e); Public Health Law § 2803-e also specifically grants protection from disclosure of statement.   Dubrey v Champlain Valley Physicians Hosp. Medical Center (1990, 3d Dept) 162 App Div 2d 903, 558 NYS2d 244.

   Hospital was entitled to summary judgment dismissing action by resident doctor for defamation after his suspension following meeting of evaluation committee, which found his performance to be unsatisfactory and potentially dangerous to patients, and communication of notice of suspension to Office of Professional Medical Conduct and American Board of Anesthesiologists, since hospital was protected by qualified privilege in communicating with

\\ 2—

those bodies, which had interest in resident's performance.  Roth v Beth Israel Medical Center (1992, 1st Dept) 180 App Div 2d 434, 579 NYS2d 373.

In breach of contract action arising out of summary suspension of anesthesiologist by defendant hospital, reports of Office of Professional Medical Conduct and Public Health Counsel were not admissible pursuant to public document exception to hearsay rule, as codified in CLS CPLR § 4520, as documents were neither certificates nor affidavits and contained opinions of witnesses who were not public officers; if such documents were admissible at all, it would be under broader common-law public document exception to hearsay rule and, if admitted, would not constitute prima facie evidence of facts contained therein, but simply evidence that jury could accept or reject. Bogdan v Peekskill Community Hosp. (1996, Sup) 168 Misc 2d 856, 642 NYS2d 478.

In breach of contract action arising out of summary suspension of anesthesiologist by defendant hospital, 39-page report of Office of Professional Medical Conduct, detailing how proceedings were conducted and on what basis findings were made, was admissible pursuant to common-law exception to hearsay rule, in view of their trustworthiness and lack of bias; however, conclusions of law and determination of penalty contained in report were clearly not admissible and would be redacted accordingly. Bogdan v Peekskill Community Hosp. (1996, Sup) 168 Misc 2d 856, 642 NYS2d 478.

In defamation action by terminated anesthesiologist, defendants (hospital and director of anesthesiology) lost protection of qualified privilege under CLS Pub Health §§ 2803-e(3)(b) and 2805-k(4) where evidence established that defendants made statements with deliberate intent to injure plaintiff, that they acted with wanton disregard of falsity of reports, and that they made disparaging statements against plaintiff to justify his termination (which had been effected in violation of hospital procedures) and to make room on hospital staff for personal friend of director of anesthesiology. Purgess v Sharrock (1994, CA2 NY) 33 F3d 134, 1994-2 CCH Trade Cases P 70691, 41 Fed Rules Evid Serv 169.

**FOOTNOTES:**
[n1] [n1] There are two sections 2803-e.



# New York State Education § 6530 Definitions of Professional Misconduct

§ 6530. Definitions of professional misconduct. Each of the following is professional misconduct, and any licensee found guilty of such misconduct under the procedures prescribed in section two hundred thirty of the public health law shall be subject to penalties as prescribed in section two hundred thirty-a of the public health law except that the charges may be dismissed in the interest of justice:

1. Obtaining the license fraudulently;
2. Practicing the profession fraudulently or beyond its authorized scope;
3. Practicing the profession with negligence on more than one occasion;
4. Practicing the profession with gross negligence on a particular occasion;
5. Practicing the profession with incompetence on more than one occasion;
6. Practicing the profession with gross incompetence;
7. Practicing the profession while impaired by alcohol, drugs, physical disability, or mental disability;
8. Being a habitual abuser of alcohol, or being dependent on or a habitual user of narcotics, barbiturates, amphetamines, hallucinogens, or other drugs having similar effects, except for a licensee who is maintained on an approved therapeutic regimen which does not impair the ability to practice, or having a psychiatric condition which impairs the licensee's ability to practice;
9. (a) Being convicted of committing an act constituting a crime under:
   (i) New York state law or,
   (ii) federal law or,
   (iii) the law of another jurisdiction and which, if committed within this state, would have constituted a crime under New York state law;
   (b) Having been found guilty of improper professional practice or professional misconduct by a duly authorized professional disciplinary agency of another state where the conduct upon which the finding was based would, if committed in New York state, constitute professional misconduct under the laws of New York state;
   (c) Having been found guilty in an adjudicatory proceeding of violating a state or federal statute or regulation, pursuant to a final decision or determination, and when no appeal is pending, or after resolution of the proceeding by stipulation or agreement, and when the violation would constitute professional misconduct pursuant to this section;
   (d) Having his or her license to practice medicine revoked, suspended or having other disciplinary action taken, or having his or her application for a license refused, revoked or suspended or having voluntarily or otherwise surrendered his or her license after a disciplinary action was instituted by a duly authorized professional disciplinary agency of another state, where the conduct resulting in the revocation, suspension or other disciplinary action involving the license or refusal, revocation or suspension of an application for a license or the surrender of the license would, if committed in New York state, constitute professional misconduct under the laws of New York state;
   (e) Having been found by the commissioner of health to be in violation of article thirty-three of the public health law;
10. Refusing to provide professional service to a person because of such person's race, creed, color or national origin;
11. Permitting, aiding or abetting an unlicensed person to perform activities requiring a license;
12. Practicing the profession while the license is suspended or

12

inactive as defined in subdivision thirteen of section two hundred thirty of the public health law, or willfully failing to register or notify the department of education of any change of name or mailing address, or, if a professional service corporation, willfully failing to comply with sections fifteen hundred three and fifteen hundred fourteen of the business corporation law or, if a university faculty practice corporation wilfully failing to comply with paragraphs (b), (c) and (d) of section fifteen hundred three and section fifteen hundred fourteen of the business corporation law;

13. A willful violation by a licensee of subdivision eleven of section two hundred thirty of the public health law;

14. A violation of section twenty-eight hundred three-d or twenty-eight hundred five-k of the public health law; or

15. Failure to comply with an order issued pursuant to subdivision seven, paragraph (a) of subdivision ten, and subdivision seventeen of section two hundred thirty of the public health law;

16. A willful or grossly negligent failure to comply with substantial provisions of federal, state, or local laws, rules, or regulations governing the practice of medicine;

17. Exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party;

18. Directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services;

19. Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law;

20. Conduct in the practice of medicine which evidences moral unfitness to practice medicine;

21. Willfully making or filing a false report, or failing to file a report required by law or by the department of health or the education department, or willfully impeding or obstructing such filing, or inducing another person to do so;

22. Failing to make available to a patient, upon request, copies of documents in the possession or under the control of the licensee which have been prepared for and paid for by the patient or client;

23. Revealing of personally identifiable facts, data, or information obtained in a professional capacity without the prior consent of the patient, except as authorized or required by law;

24. Practicing or offering to practice beyond the scope permitted by law, or accepting and performing professional responsibilities which the licensee knows or has reason to know that he or she is not competent to perform, or performing without adequate supervision professional services which the licensee is authorized to perform only under the

supervision of a licensed professional, except in an emergency situation where a person's life or health is in danger;

25. Delegating professional responsibilities to a person when the licensee delegating such responsibilities knows or has reason to know that such person is not qualified, by training, by experience, or by licensure, to perform them;

25-a. With respect to any non-emergency treatment, procedure or surgery which is expected to involve local or general anesthesia, failing to disclose to the patient the identities of all physicians, except medical residents in certified training programs, podiatrists and



dentists, reasonably anticipated to be actively involved in such treatment, procedure or surgery and to obtain such patient's informed consent to said practitioners' participation;

26.   Performing professional services which have not been duly authorized by the patient or his or her legal representative;

27. Advertising or soliciting for patronage that is not in the public interest. (a) Advertising or soliciting not in the public interest shall include, but not be limited to, advertising or soliciting that: (i) is false, fraudulent, deceptive, misleading, sensational, or flamboyant;

(ii) represents intimidation or undue pressure;

(iii) uses testimonials;

(iv) guarantees any service;

(v) makes any claim relating to professional services or products or the costs or price therefor which cannot be substantiated by the licensee, who shall have the burden of proof;

(vi) makes claims of professional superiority which cannot be substantiated by the licensee, who shall have the burden of proof; or

(vii) offers bonuses or inducements in any form other than a discount or reduction in an established fee or price for a professional service or product.

(b) The following shall be deemed appropriate means of informing the public of the availability of professional services: (i) informational advertising not contrary to the foregoing prohibitions; and

(ii) the advertising in a newspaper, periodical or professional directory or on radio or television of fixed prices, or a stated range of prices, for specified routine professional services, provided that if there is an additional charge for related services which are an integral part of the overall service being provided by the licensee, the advertisement shall so state, and provided further that the advertisement indicates the period of time for which the advertised prices shall be in effect.

(c)(i) All licensees placing advertisements shall maintain, or cause to be maintained, an exact copy of each advertisement, transcript, tape or video tape thereof as appropriate for the medium used, for a period of one year after its last appearance. This copy shall be made available for inspection upon demand of the department of health;

(ii) A licensee shall not compensate or give anything of value to representatives of the press, radio, television or other communications media in anticipation of or in return for professional publicity in a news item;

(d) No demonstrations, dramatizations or other portrayals of professional practice shall be permitted in advertising on radio or television;

28. Failing to respond within thirty days to written communications from the department of health and to make available any relevant records with respect to an inquiry or complaint about the licensee's professional misconduct. The period of thirty days shall commence on the date when such communication was delivered personally to the licensee.

If the communication is sent from the department of health by registered or certified mail, with return receipt requested, to the address appearing in the last registration, the period of thirty days shall commence on the date of delivery to the licensee, as indicated by the return receipt;

29. Violating any term of probation or condition or limitation imposed on the licensee pursuant to section two hundred thirty of the public health law;

30. Abandoning or neglecting a patient under and in need of immediate professional care, without making reasonable arrangements for the continuation of such care, or abandoning a professional employment by a group practice, hospital, clinic or other health care facility, without reasonable notice and under circumstances which seriously impair the delivery of professional care to patients or clients;

31. Willfully harassing, abusing, or intimidating a patient either physically or verbally;

32. Failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient, provided, however,

that a physician who transfers an original mammogram to a medical institution, or to a physician or health care provider of the patient, or to the patient directly, as otherwise provided by law, shall have no obligation under this section to maintain the original or a copy thereof. Unless otherwise provided by law, all patient records must be retained for at least six years. Obstetrical records and records of minor patients must be retained for at least six years, and until one year after the minor patient reaches the age of eighteen years;

33. Failing to exercise appropriate supervision over persons who are authorized to practice only under the supervision of the licensee;

34. Guaranteeing that satisfaction or a cure will result from the performance of professional services;

35. Ordering of excessive tests, treatment, or use of treatment facilities not warranted by the condition of the patient;

36. Claiming or using any secret or special method of treatment which the licensee refused to divulge to the department of health;

37. Failing to wear an identifying badge, which shall be conspicuously displayed and legible, indicating the practitioner's name and professional title authorized pursuant to this chapter, while practicing as an employee or operator of a hospital, clinic, group practice or multiprofessional facility, or at a commercial establishment offering health services to the public;

38. Entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions;

39. With respect to all professional practices conducted under an assumed name, other than facilities licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law, failing to post conspicuously at the site of such practice the name and licensure field of all of the principal professional licensees engaged in the practice at that site (i.e., principal partners, officers or principal shareholders);

40. Failing to provide access by qualified persons to patient information in accordance with the standards set forth in section eighteen of the public health law as added by chapter 497 of the laws of 1986;

41. Knowingly or willfully performing a complete or partial autopsy on a deceased person without lawful authority;

42. Failing to comply with a signed agreement to practice medicine in New York state in an area designated by the commissioner of education as

having a shortage of physicians or refusing to repay medical education costs in lieu of such required service, or failing to comply with any provision of a written agreement with the state or any municipality within which the licensee has agreed to provide medical service, or refusing to repay funds in lieu of such service as consideration of awards made by the state or any municipality thereof for his or her professional education in medicine, or failing to comply with any agreement entered into to aid his or her medical education;

43. Failing to complete forms or reports required for the reimbursement of a patient by a third party. Reasonable fees may be charged for such forms or reports, but prior payment for the professional services to which such forms or reports relate may not be required as a condition for making such forms or reports available;

44. In the practice of psychiatry, (a) any physical contact of a sexual nature between licensee and patient except the use of films and/or other audiovisual aids with individuals or groups in the development of appropriate responses to overcome sexual dysfunction and (b) in therapy groups, activities which promote explicit physical sexual contact between group members during sessions; and

45. In the practice of ophthalmology, failing to provide a patient, upon request, with the patient's prescription including the name, address, and signature of the prescriber and the date of the prescription.

46. A violation of section two hundred thirty-eight of the public health law by a professional other than a professional subject to the provisions of paragraph (f) of subdivision one of section twenty-eight

hundred five-k of the public health law.
  47.  Failure  to  use  scientifically  accepted  barrier precautions and
infection control practices as established by the department  of  health
pursuant to section two hundred thirty-a of the public health law.
  * 48. A violation of section two hundred thirty-d of the public health
law or the regulations of the commissioner of health enacted thereunder.
  * NB Effective January 14, 2008


Questions or comments: obs@health.state.ny.us
Revised: September 2007

2

## NPDB (Title IV) and Section 1921 at a Glance

| NPDB (Title IV) | Section 1921 |
|---|---|
| The National Practitioner Data Bank was established under Title IV of Public Law 99-660, the *Health Care Quality Improvement Act of 1986*. (HCQIA) | Section 1921 of the *Social Security Act*, as amended by section 5(b) of the *Medicare and Medicaid Patient and Program Protection Act of 1987*, and as amended by the *Omnibus Budget Reconciliation Act of 1990* expands Section 401-432 of the *Health Care Quality Improvement Act of 1986*. |

### NPDB (Title IV) and Section 1921 Reporters

| NPDB (Title IV) | Section 1921 |
|---|---|
| <ul><li>Medical malpractice payers</li><li>Boards of Medical/Dental Examiners</li><li>Hospitals</li><li>Other health care entities with formal peer review</li><li>Professional Societies with formal peer review</li><li>OIG and DEA</li></ul> | The NPDB reporters and<ul><li>Other State health care practitioner licensing and certification authorities</li><li>State health care entity licensing and certification authorities</li><li>Peer review organizations</li><li>Private accreditation organizations</li></ul> |

### NPDB (Title IV) and Section 1921 Queriers

| NPDB (Title IV) | Section 1921<br>* Section 1921 Information, Only |
|---|---|
| <ul><li>Hospitals</li><li>Other health care entities with formal peer review</li><li>Professional societies with formal peer review</li><li>State health care practitioner licensure and certification authorities (including medical and dental boards)</li><li>Plaintiff's attorneys (under limited circumstances)</li><li>Health care practitioners (self-query)</li><li>Researchers (statistical data)</li></ul> | The NPDB queriers and<ul><li>State health care entity licensure and certification authorities *</li><li>State agencies administering State health care programs *</li><li>Agencies or contractors administering Federal health care programs*</li><li>State Medicaid Fraud Units *</li><li>U.S. Comptroller General *</li><li>U.S. Attorney General/other law enforcement officials *</li><li>Quality Improvement Organizations *</li><li>Health care entities (self-query)</li></ul> |

### NPDB (Title IV) and Section 1921 Information

| NPDB (Title IV) | Section 1921<br>(Section 1921 only queriers receive this information) |
|---|---|
| <ul><li>Medical malpractice payments (all health care practitioners)</li><li>Adverse physician/dentist licensure actions (competence and conduct related)</li><li>Adverse clinical privilege actions</li><li>Adverse professional society membership actions</li><li>DEA actions</li><li>Medicare/Medicaid exclusions</li></ul> | <ul><li>Any adverse licensure actions (all practitioners or entities - not limited to competence and conduct)</li><li>Any negative action or finding by a State licensing or certification authority</li><li>Peer review organization negative actions or findings against a health care practitioner or entity</li><li>Private accreditation organization negative actions or findings against a health care practitioner or entity</li></ul> |

NPDB-02422.02.00

1 2

# National Practitioner Data Bank

# GUIDEBOOK



U.S. Department of Health and Human Services
Health Resources & Services Administration

U.S. Department of Health and Human Services
Health Resources and Services Administration
Division of Quality Assurance
7519 Standish Place
Suite 300
Rockville, Maryland  20857

Publication No. HRSA-95-255

## A. Introduction
Preface................................................................................................. A-1
Background ....................................................................................... A-1
   Title IV of Public Law 99-660.................................................. A-2
Civil Liability Protection.................................................................. A-2
Interpretation of NPDB Information................................................ A-3
Confidentiality of NPDB Information ............................................. A-3
Disclosure of NPDB Information .................................................... A-5
Coordination Between the NPDB and the HIPDB ......................... A-6
Official Language ............................................................................ A-6
User Fees.......................................................................................... A-6

## B. Eligible Entities
What is an Eligible Entity? .............................................................. B-1
   Defining Health Care Entities.................................................. B-2
      Hospitals ........................................................................... B-2
      Other Health Care Entities................................................ B-2
   Defining Professional Societies............................................... B-3
   Defining State Licensing Boards ............................................. B-3
   Defining Medical Malpractice Payers ..................................... B-4
Registering with the NPDB ............................................................ B-4
   Certifying Official.................................................................... B-4
Entity Recertification ...................................................................... B-5
Data Bank Identification Numbers (DBIDs) ................................... B-5
   Deactivate a DBID................................................................... B-5
   Reactivate a DBID ................................................................... B-6
User IDs........................................................................................... B-6
Update Entity Information ............................................................... B-6
Lost Your DBID?............................................................................. B-6
Organizations That May Report and Query on Behalf of Entities .... . B-6
   Authorized Submitter .............................................................. B-7
   Authorized Agents ................................................................... B-7
   Designating Authorized Agents............................................... B-8
   Questions and Answers............................................................ B-9

## C. Health Care Practitioners
Overview.......................................................................................... C-1
Defining Health Care Practitioners................................................. C-1
Practitioner Self-Query ................................................................... C-4
Self-Querying on the Internet.......................................................... C-4
Subject Information in the NPDB .................................................... C-4
Questions and Answers ................................................................... C-5

## D. Queries
Overview.......................................................................................... D-1
   Hospitals .................................................................................. D-1

12

Residents and Interns .................................................................. .... ...... D-3
Professional Societies ............................................................................ D-3
State Licensing Boards ........................................................................... D-3
Types of Queries. ..... .............................................................................. D-5
Attorney Access ...................................................................................... D-5
Authorized Agents .................................................................................. D-6
Submitting a Query to the NPDB .......................................................... D-6
    Equipment Needed to Query Electronically ..................................... D-7
    Querying Through an Authorized Agent ........................................... D-7
Query Processing ..................................................................................... D-7
    Subject Information ........................................................................... D-8
    Subject Database ............................................................................... D-8
    Character Limits ................................................................................ D-8
    Query Responses ............................................................................... D-8
    Query Response Availability ............................................................ D-9
    Missing Query Responses .................................................................. D-9
Correcting Query Information ................................................................ D-9
Failure to Query ...................................................................................... D-9
Questions and Answers .......................................................................... D-10


E. Reports
Overview .................................................................................................. E-1
    Time Frame for Reporting to the NPDB ........................................... E-1
    Civil Liability Protection ................................................................. E-1
    Official Language .............................................................................. E-1
    Computation of Time Periods ........................................................... E-1
Submitting Reports to the NPDB ........................................................... E-2
    Subject Information ........................................................................... E-2
    When Subject Information Is Unknown ........................................... E-2
    Reporting Subject Social Security Numbers .................................... E-3
    Incorrectly Identified Subject .......................................................... E-3
    Submitting Reports Via the IQRS ............................................. ...... E-3
        Draft Capability ............................................................................. E-4
    Submitting Reports to the NPDB Via ITP ........................................ E-4
Types of Reports ...................................................................................... E-4
    Initial Report .................................................................................... E-4
    Correction ......................................................................................... E-5
    Void Previous Report ....................................................................... E-5
    Revision to Action ............................................................................ E-5
Report Processing .................................................................................... E-6
Report Responses .................................................................................... E-6
    Missing Report Verification .................................................. .. ....... E-7
Reporting Medical Malpractice Payments ... .... ..................................... E-8
    Trigger Date for Reporting ............................................................... E-8
    Interpretation of Medical Malpractice Payment Information ........... E-8
    Sample Descriptions (for Illustrative Purposes Only) ...................... E-9

12

Reporting of Payments by Individuals.................................................................E-10
Payments for Corporations and Hospitals ...........................................................E-10
Deceased Practitioners ......................................................................................E-11
Identifying Practitioners ....................................................................................E-11
Insurance Policies that Cover More than One Practitioner ...................................E-11
One Settlement for More than One Practitioner ..................................................E-11
Residents and Interns.........................................................................................E-11
Students............................................................................................................E-12
Practitioner Fee Refunds....................................................................................E-12
Loss Adjustment Expenses .................................................................................E-12
Dismissal of a Defendant from a Lawsuit............................................................E-12
High-Low Agreements.......................................................................................E-13
Reporting by Authorized Agents ........................................................................E-14
Payments by Multiple Payers .............................................................................E-14
Structured Settlements .......................................................................................E-14
Subrogation-Type Payments............................................................................. E-15
Offshore Payers.................................................................................................E-15
Payments Made Prior to Settlement....................................................................E-15
Reporting Adverse Clinical Privileges Actions .........................................................E-17
Multiple Adverse Actions...................................................................................E-18
Denial of Applications........................................................................................E-18
Withdrawal of Applications ................................................................................E-19
Investigations....................................................................................................E-19
Guidelines for Investigations.........................................................................E-19
Summary Suspension.........................................................................................E-19
Examples of Reportable and Non-Reportable Actions..........................................E-21
Reporting Adverse Licensure Actions ......................................................................E-24
Effective Date of Action ....................................................................................E-24
Examples of Reportable Actions .........................................................................E-24
Examples of Non-Reportable Actions .................................................................E-25
Reporting Adverse Professional Society Membership Actions.....................................E-26
Reporting Requirements .....................................................................................E-26
Reporting Medicare/Medicaid Exclusions ................................................................E-27
Sanctions for Failing to Report to the NPDB ...........................................................E-27
Medical Malpractice Payers................................................................................E-27
Hospitals and Other Health Care Entities............................................................E-28
State Boards ......................................................................................................E-28
Professional Societies ........................................................................................E-28
Questions and Answers.......................................................................................E-29

F. Disputes
The Dispute Process...........................................................................................F-1
Subject Statements.............................................................................................F-1
Subject Disputes................................................................................................F-2
Secretarial Review .............................................................................................F-3
Pertinent Documentation ....................................................................................F-4

12

Secretarial Review Results ............................................................................................. F-4
Report Accurate as Submitted ........................................................................................ F-4
Report Inaccurate as Submitted ..................................................................................... F-5
Dispute Outside the Scope of Secretarial Review ......................................................... F-5
    Secretarial Review Overview ..................................................................................... F-5
Reconsideration of the Secretary's Decisions on Disputes ............................................ F-6
Improper Requests for Secretarial Review ..................................................................... F-6
Examples of Disputes ..................................................................................................... F-6
Due Process - Alleged Denial ......................................................................................... F-6
Due Process - Legal Action Pending .............................................................................. F-6
Licensure Completion - Trigger Date ............................................................................. F-7
Narrative Description - Inaccurate .................................................................................. F-7
Narrative Description - Legal Sufficiency ...................................................................... F-7
Narrative Description - Misleading ................................................................................. F-8
Privileges - Resignation and Surrender While Under Investigation ............................... F-8
Privileges - Suspension and Hospital Motivation .......................................................... F-9
Professional Review - Alternative Employment Termination Procedure ....................... F-9
Residency Status ............................................................................................................. F-9
Responsibility for Treatment .......................................................................................... F-9
Settlement - Subject Disagrees ....................................................................................... F-10
Settlement - Subject Dismissed from Lawsuit ............................................................... F-10
Suspension - Indefinite Length ...................................................................................... F-10
Suspension - Summary ................................................................................................... F-10
Questions and Answers ................................................................................................... F-11

**G. Fees**
Query Fees ...................................................................................................................... G-1
    Entity Query Fees ...................................................................................................... G-1
    Self-Query Fees ......................................................................................................... G-1
Methods of Payment ....................................................................................................... G-1
Account Discrepancies ................................................................................................... G-3
Credits and Debits .......................................................................................................... G-4
Bankruptcy ..................................................................................................................... G-4
Questions and Answers ................................................................................................... G-4

**H. Information Sources**
NPDB-HIPDB Web Site Assistance ............................................................................... H-1
NPDB-HIPDB Customer Service Center ....................................................................... H-1
Data Bank Addresses ...................................................................................................... H-2
Interpretation of NPDB Statutes and Regulations ......................................................... H-2
The Privacy Act and the NPDB ...................................................................................... H-2
The Freedom of Information Act and the NPDB ............................................................ H-3
Federal Employer Identification Number ....................................................................... H-3
State Medical and Dental Boards .................................................................................... H-3

12

APPENDIX A: Glossary
APPENDIX B: Laws and Regulations
APPENDIX C: Abbreviations

13

8/4/10 —
Reg'd truck
by WCA



CERTIFIED MAIL

7008 1830 0000 4288 3037

RETURN TO SENDER
REFUSED

2 N HOUSTON TX
29 JUL
PM
2010

8/28

13

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X                              ☐ Agent
                               ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

Express Mail
Return Receipt for Merchandise
☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

77678

2. Article Number

... 18 1830 0000 4288 3037

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1840



*13*

### HOSPITAL

*Since 1885, The Heartbeat of Our Community*

The WOMAN'S CHRISTIAN ASSOCIATION OF JAMESTOWN, NEW YORK

**SENT CERTIFIED, RETURN RECEIPT REQUESTED**

July 22, 2010

Dr. Barkat Hooda
501 N. Sarah Deel Dr.
Apt. #215
Webster, TX 77598

Dear Dr. Hooda:

This letter is in follow up to our conversation on Friday, June 11, 2010. As we discussed, your response to requests from labor and delivery to come into the Hospital for the care of an infant while you were on call on June 2, 2010 is under clinical investigation by the Departments of Pediatrics and Obstetrics and Gynecology. I informed you of this investigation and requested that you meet with Marlene Garone, MD, VPMA/Medical Director prior to leaving Jamestown. You stated that you understood this request and agreed to the appointment on Monday, June 14, 2010 at 1:30 p.m. to meet with her.

Multiple attempts have been unsuccessfully made to locate a forwarding phone number to speak with you directly regarding the next step in this investigation. This letter is being sent to the only address that could be located which is currently on file with the Texas Medical Board.

I am writing to inform you that your failure to present for that appointment is consistent with the New York State definition of professional misconduct as defined by Public Health Law, Article 28, Hospitals. Therefore, WCA Hospital will be reporting this incident to the New York State Office of Professional Misconduct (OPMC) as required by state law and they will determine if further investigation is warranted.

Respectfully yours,

Betsy T. Wright, FACHE
President/CEO

attachment – Pediatric Care Committee "Letter to File"

cc:   Marlene Garone, MD – VP Medical Affairs/Medical Director



13

*Since 1885, The Heartbeat of Our Community*

The WOMAN'S CHRISTIAN ASSOCIATION OF JAMESTOWN, NEW YORK

July 13, 2010

Dr. Hooda,

The Department of Pediatrics, in review of the case of                as found that you did not meet the standard of care of this department in your refusal to attend the delivery for which you were the responsible pediatrician.

Your responsibilities as an on call pediatrician were made very clear at the time of your appointment. You did not meet those obligations. This letter is being sent to you to inform you of the outcome of this peer review and will be entered in your quality review file.

Virginia Campion, MD
Pediatric Department Chairman



*14*

**HOSPITAL**          *Since 1885, The Heartbeat of Our Community*

The WOMAN'S CHRISTIAN ASSOCIATION OF JAMESTOWN, NEW YORK

*August 26, 2010*

*The University of the State of New York*
*Office of the Professions*
*Division of Professional Licensing Services*
*89 Washington Ave.*
*Albany, NY  12234-1000*

*Dear Sir or Madam:*

      *RE:    Barkat Hooda, MD*
             *Lic#: 003422*

*Please find enclosed a copy of an Adverse Action Report on the above listed physician as*
*required by Federal law (42 USC §11134(b)(2)).*

*If any questions please feel free to contact me at (716) 664-8291.*

*Thank you.*

*Sincerely,*

*Marlene Garone, MD*
*VP-Medical Affairs/Medical Director*

*MG:cg*
*Encls.*

National Practitioner Data Bank
Healthcare Integrity and Protection
Data Bank
P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

| | |
|---|---|
| DCN: 5500000064046116 | |
| Process Date: 08/26/2010 | |
| Page: 1    of   2 | |
| HOODA, BARKAT | |
| For authorized use by: | |
| WCA HOSPITAL | |

# ADVERSE ACTION REPORT
## TITLE IV CLINICAL PRIVILEGES ACTION
### Report Number: 5500000064046116
### This report is maintained under the provisions of:

| [X] Title IV (NPDB) | [ ] Section 1921 (NPDB) | [ ] Section 1128E (HIPDB) |
|---|---|---|

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended; and 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of Federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | WCA HOSPITAL |
| Address: | 207 FOOTE AVE |
| | P.O. BOX 840 |
| City, State, Zip: | JAMESTOWN, NY 14702-0840 |
| Country: | |
| Name of Office: | CAROL N. GALLAGHER, CPS, CPCS |
| Title or Department: | CREDENTIALING SPECIALIST |
| Telephone: | (716) 487-0141 Ext. 8422 |
| Entity Internal Report Reference: | |
| Customer Use: | 1762 |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | HOODA, BARKAT |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 05/06/1968 |
| Organization Name: | WCA HOSPITAL |
| Work Address: | 207 FOOTE AVE. |
| | PO BOX 840 |
| City, State, ZIP: | JAMESTOWN, NY 14702-0840 |
| Home Address: | 165 FRONT STREET |
| City, State, ZIP: | LAKEWOOD, NY 14750 |
| Deceased: | NO |
| Social Security Numbers (SSN): | ***-**-8321 |
| Professional School(s) & Year(s) of Graduation: | THE AGA KHAN UNIVERSITY (1991) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) (010) |
| State License Number, State of Licensure: | 003422, NY |
| Drug Enforcement Administration (DEA) Numbers: | FH1623912 |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | WCA HOSPITAL |
| Business Address of Affiliate: | PO BOX 840 |
| | 207 FOOTE AVE. |
| City, State, ZIP: | JAMESTOWN, NY 14702 |
| Nature of Relationship(s): | SUBJECT HAS CLINICAL PRIVILEGES WITH AFFILIATE OR ASSOCIATE (350) |

**C. INFORMATION REPORTED**

| | |
|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| Basis for Action: | INAPPROPRIATE REFUSAL TO TREAT (FA) |
| Adverse Action Classification Code(s): | VOLUNTARY SURRENDER OF CLINICAL PRIVILEGE(S), WHILE UNDER, OR TO AVOID, INVESTIGATION RELATING TO PROFESSIONAL COMPETENCE OR CONDUCT (1635) |

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

*14*

National Practitioner Data Bank
Healthcare Integrity and Protection
Data Bank
P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

DCN: 5500000064046116
Process Date: 08/26/2010
Page: 2   of   2
HOODA, BARKAT
For authorized use by:
WCA HOSPITAL

| | |
|---|---|
| Date Action Was Taken: | 07/13/2010 |
| Date Action Became Effective: | 07/22/2010 |
| Length of Action: | PERMANENT |

Description of Subject's Act(s) or Omission(s) or Other
Reasons for Action(s) Taken and Description of Action(s) Taken
by Reporting Entity:   Physician refused to attend a delivery for a critically
ill infant when he was the responsible physician on
call.  Physician resigned his medical staff privileges
and left the area while under investigation for his
failure to respond as required.

**D. SUBJECT
STATEMENT**   If the subject identified in Section B of this report has submitted a statement, it appears in this section.

**E. REPORT STATUS**   Unless one or more boxes below are checked, the subject of this report identified in Section B has not contested this report.

☐   If box is checked, this report has been disputed by the subject identified in Section B.

☐   If box is checked, at the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements. No decision has been reached.

☐   If box is checked, at the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:   08/26/2010
Date of Most Recent Change:   08/26/2010

**END OF REPORT**

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BARKAT S. HOODA, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 4:10-CV-05022 |
| | § | |
| W.C.A. SERVICES CORPORATION | § | |
| d/b/a WCA HOSPITAL, | § | |
| BETSY T. WRIGHT, | § | |
| VIRGINIA B. CAMPION, M.D., | § | |
| TARIQ M. KHAN, M.D., and | § | |
| ROBERT L. DANIELS, M.D., | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF TARIQ M. KHAN, M.D.

| | |
|---|---|
| STATE OF NEW YORK | § |
| | § |
| COUNTY OF CHAUTAUQUA | § |

BEFORE ME, the undersigned authority, personally appeared Tariq M. Khan, M.D.,

being by me duly sworn, deposed as follows:

1.  My name is Tariq M. Khan. I am of sound mind, over the age of twenty-one (21) years, have never been convicted of a felony or other crime involving moral turpitude, and am capable of making this Affidavit. I am fully competent to testify to the matters stated herein. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

2.  I am currently an employee of Southern Tier Pediatrics Practice, P.C. ("Southern Tier Pediatrics"), a professional corporation organized under the laws of the State of New York with an address at 1684 Foote Avenue Extension, Jamestown, NY 14701. I reside at 53 Grandview, Lakewood, New York 74750, and have lived in this area since 1996. I have been a resident of the State of New York since 1992.

3.  I am a board certified pediatrician licensed by the State of New York and a fellow of the American Academy of Pediatrics. I am a graduate of the State University of New York Health System Pediatric Residency Program in Syracuse, New York. I have never attended any college, university or other educational institution located in Texas. I have never sought or held a license to practice medicine in Texas.

1

4.   I am the founder of Southern Tier Pediatrics and have been employed there since 1999.  Prior to this date, I was employed by Jamestown Pediatric Associates in Jamestown, New York from 1996-1999.  I have never held any employment or engaged in business in Texas, nor have I owned or been employed by any entity that is affiliated with any Texas-based entity, to the best of my knowledge.  I have never had any employees, agents or servants in Texas.

5.   I was born in Pakistan in 1968.  I attended medical school at Dow Medical College in Karachi, Pakistan and obtained my degree in 1991.  After completing my residency in pediatrics in Syracuse, New York from 1993-1996, I relocated to Jamestown, NY, where I currently reside.  I have never lived in Texas, performed work in Texas, solicited work or business in Texas, or solicited work or business from Texas residents or companies.  By this last statement, I mean that I never called or otherwise contacted a Texas resident or a company located in Texas for the purpose of soliciting work or business.

6.   I have never been on the Board of Directors for a Texas company or an officer of any Texas company.  I have never been required to maintain or actually maintained a registered agent for service in Texas, maintained a place of business, other office, mailing address, or telephone number in Texas, paid or owed any taxes in Texas, owned, leased, rented, or controlled any real or personal property in Texas, held, opened, or maintained any brokerage accounts or bank accounts in Texas, maintained records in Texas, entered into or executed any agreements or contracts in Texas, been a member of any Texas professional organization or been licensed or certified by any Texas entity or agency, filed, been a party to, or testified in any lawsuits in Texas (with the exception of my involuntary status as a defendant in the instant lawsuit), or advertised or maintained a website in Texas. I have never maintained, or been required to maintain, any insurance in Texas. Also, to my knowledge, I have never owned stock, securities, negotiable instruments, or commercial paper that was located in Texas.

7.   I have been to the State of Texas on several occasions for purely personal reasons to visit family, including my mother and brother who both reside there.  I visited my brother in Austin, Texas one time per year over a four year period while he was studying at the University of Texas at Austin for two-three days at a time. Since 2004, my brother has lived in Dallas, Texas and I visit him a few times each year.  My mother moved to Texas in 2005 and resides with my brother in Dallas, Texas.

8.   Other than my trips to Texas for personal reasons to visit my immediate family members, I have never been to Texas.  During my trips to Texas to visit family, I did not engage in any business, or attempt to solicit any business, during this trip. I have never traveled to Texas for business reasons for the purpose of conducting sales or revenue-generating business in Texas.  I have not attended any continuing medical education in Texas or any seminars for business purposes.

9.   If I am required to remain in this lawsuit, the travel from New York to Texas to

2

attend case-related events would impose a significant burden on me. In addition, travel to Texas would impose a significant burden on my medical practice and my patients as a result of the necessary absences from work. I am responsible as a supervising physician for two of the nurse practitioners at Southern Tier Pediatrics. Between the two nurse practitioners and myself, we see approximately 80 to 90 patients each day. Even short trips would be a significant burden on my patients and would require closing our satellite offices in Randolph, New York during that period because I am the sole supervising medical doctor available to oversee the nurse practitioner that runs that office. Because the acts I am accused of could only have occurred, if at all, in New York, requiring me to travel to Texas several times for this lawsuit would substantially disrupt my legitimate business activities and constitute a significant time, monetary, and personal burden for me.

10.   In or around December 2008, Southern Tier Pediatrics placed an advertisement seeking to add another pediatrician to its practice. Dr. Barkat S. Hooda, M.D. ("Dr. Hooda") who was working in Saudi Arabia at the time, responded to Southern Tier Pediatrics' advertisement which outlined the responsibilities of the general pediatrician position, including stabilization of unstable newborns not limited to inserting intravenous (IV) /central lines and ET intubation. Dr Hooda not only responded to the advertisement, but confirmed via e mail that he is very comfortable with all of the above. A true and correct copy of Dr. Hooda's December 28, 2008 email is attached as Exhibit 1 to my affidavit.

11.   After interviewing Dr. Hooda for the position, in March 2009, Southern Tier Pediatrics agreed to bring Dr. Hooda to the United States and employ him full time beginning in October 2009. The parties memorialized the employment relationship between Dr. Hooda and Southern Tier Pediatrics in a formal employment contract made March 6, 2009. A true and correct copy of Dr. Hooda's employment contract with Southern Tier Pediatrics is attached as Exhibit 2 to my affidavit.

12.   During his tenure at Southern Tier Pediatrics, Dr. Hooda had staff privileges at Woman's Christian Association ("WCA") Hospital in Jamestown, New York ("WCA Hospital"). Medically, Dr. Hooda was a competent physician and was properly credentialed and certified to perform many neonatal procedures, or procedures relating to newborn children. I supervised him on many occasions when he joined Southern Tier Pediatrics, and was satisfied with his medical performance.

13.   I was not satisfied with Dr. Hooda's demeanor, however. Dr. Hooda would often arrive late for work, and was often difficult to work with and argumentative. During his tenure at Southern Tier Pediatrics, we had a number of problems with Dr. Hooda's work ethic and complaints from patients as well as office staff, including, for example, his willingness to stay after hours and assist on a rotating basis with H1N1 clinics during flu season epidemics in late 2009.

3

14. Dr. Hooda must have also felt the professional match was not successful, as he gave notice of his intent to resign in May 2010. Given the number of disruptions that Dr. Hooda caused to the pediatrics practice at Southern Tier Pediatrics since his arrival in October 2009, it was our relief that Dr. Hooda had located new employment and would be leaving voluntarily. A true and correct copy of our letter accepting Dr. Hooda's resignation from Southern Tier Pediatrics is attached as Exhibit 3 to this Affidavit.

15. The employment contract with Southern Tier Pediatrics required Dr. Hooda to give 120 days' notice of his intent to resign. The earliest he could leave Southern Tier Pediatrics under the contract was late August 2010. During this notice period, however, Dr. Hooda's performance deteriorated further. He would often resist taking on-call assignments, even refusing to come to work when he was on call, and would be unavailable to see patients and supervise nurse practitioners in the office when needed.

16. Dr. Hooda was the on-call physician on June 2, 2010, and was called in to assist with a high-risk delivery at WCA Hospital. Despite being on call, Dr. Hooda refused to report to WCA Hospital and asked the nurse manager who called him to call Dr Khan (even though I was not medical doctor on call) and said if Dr Khan was not available then to call someone else. He stated that he would not be coming in. WCA hospital then called me in at approximately 12:30 p.m. and relayed what Dr. Hooda had told the nurse manager at WCA Hospital. I immediately traveled to the hospital to attend to the patient, and phoned Dr. Hooda in route to the hospital, insisting that he report to work or that I would report him to the New York State Office of Professional Medical Conduct ("OPMC") for patient abandonment. I also told the nurse manager to call Dr. Hooda and tell him to get to the hospital right away. When Dr. Hooda finally arrived at the hospital, he was too late to provide any meaningful assistance, nor was he fully informed about the patient and the circumstances surrounding the delivery. Even though he was present at delivery, I provided the necessary care to the newborn after delivery with the help of appropriate staff and nurses and was responsible for all decisions relating to the care of the newborn and the necessary procedures. Unfortunately, the infant did not survive the delivery secondary to extreme prematurity and complications related to extreme prematurity. Despite his lack of information on the patient's condition, Dr. Hooda made notations in the newborn's mother's chart concerning the conduct of other doctors that were not appropriate given his limited involvement with the patient.

17. Shortly thereafter, Dr. Hooda notified both WCA Hospital and Southern Tier Pediatrics that contrary to his earlier resignation notifications in May 2010 that he would be leaving for Texas before the end of June as opposed to fulfilling his contractual obligation with Southern Tier Pediatrics to work until late August 2010. These actions left Southern Tier Pediatrics with no choice but to formally terminate Dr. Hooda for cause on June 11, 2010, and he was told not to return to the practice. Southern Tier Pediatrics issued a formal dismissal letter terminating Dr. Hooda on June 11, 2010. A true and correct copy of this letter is attached as

4

Exhibit 4 to this Affidavit.

18.   No threats were issued to Dr. Hooda on June 11, 2010 other than to address the fact that Dr. Hooda should not be engaging in "chart wars" and attempting to destroy the reputations of doctors in the Jamestown community and WCA Hospital. That conduct could potentially lead to legal action against Dr. Hooda by WCA Hospital regardless of where he relocated. A true and correct copy of the summary of this meeting which was prepared by the office manager for Southern Tier Pediatrics, who was present at the meeting, is attached as Exhibit 5 to this Affidavit.

19.   After Dr. Hooda's separation from employment with Southern Tier Pediatrics, I was unable to locate him to send him his final paycheck and other documents. He left no forwarding address or other information. While Dr. Hooda had informed Southern Tier Pediatrics that he would be moving to Texas to work for a teaching hospital, we did not know any further information regarding his future plans and which organization and children's hospital he will be working for in Texas.

20.   The Plaintiff has alleged that W.C.A. Services Corporation, which I know as WCA Hospital, filed a report about Dr. Hooda with the U.S. Department of Health and Human Services National Practitioner Data Bank (the "NPDB"). To date, I have never seen a copy of this NPDB report.

21.   I first learned that WCA Hospital may be filing a report on Dr. Hooda in July 2010 when I received a courtesy call from the President of the medical staff for WCA Hospital alerting me as Dr. Hooda's past employer that WCA Hospital was filing a report with the NPDB on Dr. Hooda. At that time or thereafter, I did not discuss the substance of the NPDB report with anyone from WCA Hospital, or anyone at all, prior to its actual filing with the NPDB in August 2010. I did not participate in any internal investigation conducted by WCA Hospital concerning Dr. Hooda. Nor did any person or entity contact me for a statement concerning the NPDB report on Dr. Hooda or my recollection of events on June 2, 2010. Only recently (January 2011) was I contacted by the OPMC for the State of New York regarding Dr. Hooda and the NPDB Report.

FURTHER AFFIANT SAYETH NOT.

_____     2/14/11
Tariq M. Khan

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned Notary Public, on this
14th day of February, 2011.

_____

MELANIE R COOK, NO. 01CO6182753
Notary Public, State of New York
Qualified in Chautauqua County
Commission Expires December 27, 20 11

5

*16*



S O U T H E R N   T I E R

P R A C T I C E ,   P . C .

**Tariq M. Khan, MD, FAAP**
**Barkat S. Hooda, MD, FAAP**
Katie M. Bell, RPA-C
Amy R. Beach, FNP

1684 Foote Avenue Extension
Jamestown, NY 14701
Phone: (716) 661-9730
Fax: (716) 661-9732

One Bank Street
Randolph, NY 14772
Phone: (716) 358-KIDS (5437)
Fax: (716) 358-5438

www.southerntierpeds.net

May 3, 2010

Barkat S. Hooda, MD
165 Front Street
Lakewood, NY 14750

Dear Barkat

Thank you for your notice of resignation. We can certainly appreciate your desire to move closer to family.

Based on hospital, department of pediatrics, and practice protocol, part of having an active staff assignment with the hospital includes accepting their calls and treating patients as necessary when we are on call. Not providing care for a critically ill newborn when on call could be construed as patient abandonment. Therefore, neonatal care at WCA Hospital cannot be assigned to any other physicians.

We wish you great success in your future and all the best for you and your family. If there is anything we can do to help you and support you in your transition, please let us know.

Sincerely

Tariq M. Khan, M.D., F.A.A.P.

pd

EXHIBIT
3

June 11, 2010


Barkat S. Hooda, MD

*** Hand-delivered June 11, 2010 ***

Dear Dr. Hooda

1. You previously mutually agreed your last day of employment with the Practice would be August 31, 2010;
2. You thereafter discussed modifying your last day of employment to June 30, 2010;
3. Today, June 11, 2010, you informed me for the first time via e-mail at 12:50 pm your last day of employment would be June 13, 2010. In other words, you provided less than 3 days' notice;
4. Your limited notice potentially jeopardizes patient care and raises ethical concerns; and
5. As per Article 15, the Liquidated Damages clause in the contract, the practice reserves the right to recoup and collect monies, such as but not limited to, recruitment costs and moving allowances, which will be withheld from any remaining salary or monies owed as the notice of resignation falls short of the 120 day requirement.
6. Southern Tier Pediatrics Practice, P.C. reserves all rights it may have regarding that limited notice and your unilateral resignation.


Sincerely


Tariq M. Khan, M.D., F.A.A.P.

pd

EXHIBIT
4

dismissal termination meeting 06112010.txt

NOTICE OF DISMISSAL

June 11, 2010

Meeting began: 4:05 pm EST

Present: Tariq M. Khan, MD; Barkat Hooda, MD; Patricia D'Angelo, Office Manager

- Dr. Khan discussed e-mail received today and provided Dr. Hooda with a written response.

- Dr. Khan advised Dr. Hooda that attorneys would review the employment contract to determine any monies owed and any

garnishments to take place under the liquidated damages clause.

- DR. KHAN ADVISED DR. HOODA NOT TO RETURN TO THE OFFICE ON MONDAY.

- Dr. Khan requested forwarding address. Dr. Hooda stated that there was no forwarding address. Dr. Khan told Dr. Hooda that he

needs to call us with a forwarding address.

- Dr. Khan advised Dr. Hooda that attorney Michael Berger's office has notified INS of the termination of employment.

- Dr. Khan advised Dr. Hooda not to send any further e-mails. Dr. Khan instructed Dr. Hooda to direct any further correspondence to

the practice's corporate attorney, Dana Lundberg.

- Dr. Khan did wish Dr. Hooda all the best moving forward. The meeting ended on a positive note.

Meeting ended: 4:17 pm EST

Patricia D'Angelo, Office Manager

EXHIBIT

5

*19*

## AFFIDAVIT OF DONNA BARBER

STATE OF NEW YORK          )
                           ) SS:
COUNTY OF CHAUTAUQUA       )

DONNA BARBER, RN, being duly sworn, deposes and says:

1.      On June 2, 2010, I was the Obstetrics Coordinator at WCA Hospital. I have experience in neonatal resuscitation.

2.      On June 2, 2010, I was working as a neonatal nurse at WCA Hospital because there was a new neonatal nurse working that day.

3.      I am familiar with the medical care and treatment provided to Patient NC and her baby on June 2, 2010.

4.      Patient NC in this case had ruptured membranes.  There were notes in Patient NC's chart that she was a high risk pregnancy and that they were to follow Women's and Children's Hospitals of Buffalo's protocols for transfer of patients with high risk pregnancies.  Dr. Hooda would have been aware of the patient's medical history if he reviewed her chart.

5.      On June 2, 2010, the baby was at twenty two and five days (22 5/7) weeks gestation. A baby of twenty two and five days (22 5/7) weeks gestation is considered nonviable.  According to the Women's and Children's Hospital of Buffalo protocols, twenty three (23) weeks is considered to be a viable baby. At twenty two and five days

(22 5/7) weeks gestation, Women's and Children's Hospital of Buffalo would not have accepted Patient NC for transfer to that facility for delivery.

6.     On June 2, 2010, Patient NC began complaining of pressure and the need to push. At that time, Patient NC was not medically stable for transfer. The obstetrician on call was Dr. Robert Daniels.

7.     Dr. Daniels developed a delivery plan for the baby with Patient NC. Dr. Daniels made Patient NC aware that the baby would most likely not survive the delivery.

8.     In situations where there is a delivery of an anticipated non-viable baby, it is the standard of care in the community for a hospital to request the patient's pediatrician to be there for possible resuscitation purposes. Another reason that a pediatrician is present during a non-viable birth is to provide emotional support for the parents and to show the parents that the baby's life mattered. These practices are within the standard care for WCA and other hospitals.

9.     At the direction of Dr. Daniels, I attempted to contact Dr. Hooda, who was the Patient NC's pediatrician.

10.     I was able to reach Dr. Hooda. I requested that he appear at the delivery pursuant to Dr. Daniels's request. Dr. Hooda responded that I should call either Dr. Khan or Jamestown Pediatrics. I provided him with a report of Patient NC, which included the fact that the baby was most likely non-viable. I also indicated to him that for the patient's comfort, Dr. Daniels requested that he attend. Dr. Hooda responded that he should not have to attend and that the baby and mother should be transferred. I

responded that transfer was not an option and that delivery was imminent. In response to this, Dr. Hooda stated that he did not feel that he should attend. In my experience as an OB Nurse, I have never had a doctor refuse to attend such a request.

11.     Dr. Hooda then asked me whether Dr. Khan was in town, and he then told me that I should call Dr. Khan and have him come in instead. The call with Dr. Hooda ended at that time. I then contacted Dr. Khan, who told me he would be right there. Dr. Khan also told me that I should call Dr. Hooda back and tells him that he had to come to the delivery. Dr. Khan also indicated to me that I should tell Dr. Hooda it could be perceived as patient abandonment if he did not attend the delivery. I then contacted Dr. Hooda again, but he did not answer his phone. I left a voicemail message for him pursuant to Dr. Khan's direction. I then attempted to contact Dr. Hooda about every five (5) minutes, which is reflected in my narrative note in the chart, a copy of which is attached. He did not answer his phone during those attempts by me.

12.     Eventually, Dr. Hooda picked up his phone. When he answered, Dr. Hooda started yelling at me for leaving a message on his phone. Dr. Hooda then told me he was coming to the Hospital and also asked if Dr. Khan was coming in as well.

13.     On June 2, 2010, Dr. Khan arrived at the Hospital first. Dr. Khan met with Patient NC and told her that there was not much chance of survival for the baby. Resuscitation was across the hall from where the delivery was and the hospital was prepared to do a resuscitation of the baby after birth, if required.

14.     According to the chart notes, at time 1312 (1:12 p.m.), the baby was about to be born.  However, upon arrival at the Hospital, Dr. Hooda did not go directly to the OR, but instead went to the Hospital's administration department first to complain.

15.     At 1316 (1:16 p.m.), Hooda arrived at the OR.  Dr. Hooda did not provide any care to Patient NC or the baby during the delivery.   Dr. Khan provided resuscitative care. The only direct contact that Dr. Hooda had with the baby was to confirm that there was no heartbeat. This was at the direction of Dr. Khan.

16.     After the delivery, Dr. Hooda made a notation in Patient NC's chart that contained inappropriate or incorrect statements about his role in the delivery and the capabilities of WCA Hospital.

_Donna Barber Rnc_
DONNA BARBER, RN

Sworn to on _11th_ day of

_August_, 2011

_Joyce E. Lapham_
NOTARY PUBLIC

JOYCE E. LAPHAM, #01LA5035265
NOTARY PUBLIC, State of New York
Qualified in Chautauqua County
My Commission Expires Nov. 17, 2013