UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARKAT S. HOODA, M.D.<br><br>    *Plaintiff,*<br><br>v.<br><br>W.C.A. SERVICE CORPORATION<br>d/b/a WCA HOSPITAL, ET AL.,<br><br>    *Defendants.* | WDNY DOCKET NO. 1:11-cv-00504 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW BARKAT S. HOODA, M.D. ("Plaintiff" or "Hooda"), by and through his undersigned attorneys, and files this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.  Based on the evidence, facts, evidence, and case law cited herein, Plaintiff respectfully asks the Court to deny Defendants' Motion for Summary Judgment.

Dated: July 30, 2012

Respectfully Submitted,

**HUGHES ELLZEY, LLP**


    */s/ William Craft Hughes*
William Craft Hughes, Esq.
*Attorney-In-Charge*
HUGHES ELLZEY, LLP
2700 Post Oak Blvd., Suite 1120
Houston, TX 77056
Phone (888) 350-3931
Fax (888) 995-3335
E-Mail: craft@crafthugheslaw.com

**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ...................................................................................1

II.  STANDARD OF REVIEW ......................................................................1

III. STATEMENT OF FACTS .......................................................................2

IV.  ARGUMENTS & AUTHORITIES ...........................................................2

   A.   NPDB Report Immunity is
      Unavailable to Defendants ...................................................................3

       *1.*   *Legislative History of HCQIA* ...................................................3

       *2.*   *Case Law Interpreting HCQIA* ................................................4

       *3.*   *NPDB Guidebook* ......................................................................5

   B.   Professional Review Action is
      Unavailable to Defendants ...................................................................7

       *1.*   *Applicable Standards* ...............................................................7

       *2.*   *Satisfaction of Safe Harbor Requirements* ..............................8

       *3.*   *Provision of "Other Procedures as
           are Fair Under the Circumstances"* .........................................9

           *a.*   *Garone's E-Mail* ..........................................................10

           *b.*   *Letters Allegedly Sent to
              Dr. Hooda in July* .........................................................12

           *c.*   *Alleged Telephone Calls
              to Dr. Hooda* ................................................................13

       *4.*   *No Waiver by Dr. Hooda* ........................................................16

   C.   Plaintiffs' Demand For Preliminary
      Injunction Must be Upheld ................................................................16

   D.   Defendants Are Not Entitled to Attorney's Fees ...............................17

i

CONCLUSION....................................................................................................................17

## INDEX OF AUTHORITIES

**Case Law**                                                                                     **PAGE**

*Austin v. McNamara*,
    979 F.2d 728 (9th Cir. 1992) ........................................................................1

*Brown v. Medical College of Ohio*,
    79 F. Supp.2d 840 (N.D. Ohio 1999) ...........................................................1

*Chapman v. Choicecare*,
    2002 U.S. App. LEXIS 24460 (2nd Cir. 2002) ...............................................1

*Chudacoff v. United Medical Center*,
    609 F. Supp.2d 1163 (D. Nev. 2009) ............................................................1

*Cronin v. Aetna Life*,
    46 F.3d 196 (2nd Cir. 1995) ...........................................................................1

*Gallegos v. Top RX*,
    2008 US Dist. LEXIS 119433 (WDNY 2008) ...............................................1

*HECI Exploration v. Holloway*,
    862 F.2d 513 (5th Cir. 1988) ........................................................................1

*Hussein v. Duncan Regional Hospital*,
    2009 U.S. Dist. LEXIS 38320 (W.D. Okla. 2009) .........................................1

*JEM, Inc. v. Seneca Ins.*,
    309 Fed. Appx. 491 (2nd Cir. 2009) ..............................................................1

*Kunajukr v. Lawrence & Memorial Hospital*,
    2009 U.S. Dist. LEXIS 129545 (D. Conn.) ...................................................1

*LTA Group, Inc. v. J.B. Hunt*,
    101 F. Supp.2d 93 (NDNY 2000) .................................................................1

*Mathews v. Lancaster General Hospital*,
    883 F. Supp. 1016 (E.D. Pa. 1995) ..............................................................1

*Monroe v. AMI Hospitals Of Texas, Inc.*,
    877 F. Supp. 1022 (S.D. Tex. 1994) .............................................................1

*Omar v. Jewish Hosp. Healthcare Services*,
    153 SW3d 845 (Ky. App. 2004) ...................................................................1

## **Case Law** <span style="float:right">PAGE</span>

*Osuagwu v. Gila Regional Medical Center*,
    2010 U.S. Dist. LEXIS 43225 (D. N. Mex. 2012)...........................................................1

*Peyton v. Johnson City Medical Center*,
    101 SW3d 76 (Tenn. App. 2002).....................................................................................1

*Smith v. Ricks*,
    31 F.3d 1478 (9th Cir. 1994) .........................................................................................1

*Wheeler v. Methodist Hospital*,
    95 SW3d 628 (Tex. App.–Houston [1st Dist.] 2002, no pet.) ..........................................1

## **Statutes & Rules** – Federal

**Statutes & Rules** – Federal            **PAGE**

42 U.S.C. § 11111.................................................................................1

42 U.S.C. § 11112.................................................................................1

42 U.S.C. § 11113.................................................................................1

42 U.S.C. § 11133.................................................................................1

42 U.S.C. § 11137.................................................................................1

42 U.S.C. § 11151.................................................................................1

**Statutes & Rules** – State

TEX. OCC. CODE § 160.008...................................................................1

<u>**Secondary Authorities**</u>                                                    **PAGE**

1986 House Report 99-903 ...............................................................................1

HHS, <u>NPDB Guidebook</u> (2001) ....................................................................1

Van Tassel, Blacklisted<u>: The Constitutionality</u>
<u>of the Federal System For Publishing Reports of</u>
<u>"Bad Doctors" in the National Practitioner Data Bank</u>,
      33 Cardozo L. Rev. 2031 (2012) .....................................................1

Erwin, <u>Analyzing the Disruptive Physician: How</u>
<u>State and Federal Courts Should Handle Whistleblower</u>
<u>Cases Brought by Disruptive Physicians</u>,
      44 Duq. L. Rev. 275 (2006) .........................................................1

## I.    INTRODUCTION

The essence of this lawsuit concerns a bogus investigation of Dr. Hooda launched by defendants W.C.A. SERVICES CORPORATION d/b/a WCA HOSPITAL ("WCA") and BETSY WRIGHT ("Wright"), and the subsequent filing of a false report with the U.S. Department of Health and Human Services' ("HHS") National Practitioner Data Bank ("NPDB").   The essence of Defendants' summary judgment motion concerns their claim to immunity as to all of Dr. Hooda's allegations, pursuant to the federal statutes which established the NPDB.   Although such statutes provide two distinct types of immunity, Dr. Hooda demonstrates below that defendants are not entitled to protection under either.

## II.    STANDARD OF REVIEW

Genuine issue of material fact as to whether hospital intended false statements in bills sent to Medicaid to be used and be material to government's decision to pay or approve false claims precluded summary judgment in qui tam action against hospital on ground that relator could not satisfy False Claims Act's (FCA) "presentment" requirement. *U.S. ex rel. Romano v. New York-Presbyterian Hosp.,* S.D.N.Y.2008, 571 F.Supp.2d 473.   Presence of unresolved factual issues that are material to outcome of litigation *mandates* denial of summary judgment. *GSGSB, Inc. v. New York Yankees,* S.D.N.Y.1994, 862 F.Supp. 1160 (emphasis added). Credibility determinations, not suitable for summary judgment, had to be made to determine if supervisor actually made statements that Asian, male, 61-year-old employee accused him of making and whether articulated reasons for employee's discharge were legitimate or mere pretext for supervisor's discriminatory attitude, on claim under New York State Human Rights Law alleging employment discrimination on basis of age, race, and national origin. *Bang v. IBM*

*Corp.,* E.D.N.Y.2009, 600 F.Supp.2d 430.  "Factually unsupported" claims or defenses, which summary judgment serves to isolate and dispose of, cannot include those for which factual support may exist, but is unavailable to non-moving party simply because movant is only one with personal knowledge of facts. *Davis v. City of New York,* S.D.N.Y.2001, 142 F.Supp.2d 461. Summary judgment is inappropriate where disputed fact is peculiarly within knowledge of one party. *Rolnick v. El Al Israel Airlines, Ltd.,* E.D.N.Y.1982, 551 F.Supp. 261.  Issues concerning negligence, such as observance of due care and avoidability of accident, are ordinarily not susceptible to summary adjudication and, even where plaintiff appears to have established prima facie case, if defendant has submitted explanation in opposition, determination regarding negligence should not be taken away from jury by grant of summary judgment. *St. Cyr v. Greyhound Lines, Inc.,* E.D.N.Y.1980, 486 F.Supp. 724.  In deciding on summary judgment whether jury should be allowed to pass upon statements alleged to be defamatory, under New York law, court need only determine that contested statements are reasonably susceptible of defamatory connotation; if any defamatory construction is possible, it is question of fact for jury whether statements were understood as defamatory. *Thompson v. Bosswick,* S.D.N.Y.2012, 2012 WL 626266.

## III.   STATEMENT OF FACTS

Plaintiff incorporates by reference the facts set forth in the Local Rule 56 Statement of Material Facts and Appendix, and the Attorney Affidavit of William Craft Hughes sworn to on July 30, 2012.

## IV.   ARGUMENT & AUTHORITIES

In essence, Defendants here seek summary judgment on the grounds that they are entitled to immunity – pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 USC §

11101et seq. – as to all of Dr. Hooda's causes of action relating to Defendants' filing of a false report with the NPDB.  Defendants claim such immunity under two distinct provisions of HCQIA, "report immunity" under § 11137(c), and "professional review action immunity" under § 11111(a)(1).  However, neither such immunity provision properly applies here, for the reasons set forth below.

**A.      NPDB Report Immunity is Unavailable to Defendants**

Although § 11137(c) does indeed immunize parties who make *certain* reports to the NPDB, § 11133(a) sets out the parameters of which reports qualify under such "report immunity."  In their Motion, Defendants appear to assert that they are entitled to immunity under § 11133(a)(1)(B)(i) thereof, which extends to a health care entity which "accepts the surrender of clinical privileges of a physician …while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct."

In our case, the salient fact is that Dr. Hooda tendered his resignation on May 3, 2010, well before the June 2 Incident itself, or the alleged June 7 decision by Defendants' OB/GYN Care Evaluation Committee to begin an investigation of the Incident.  It is therefore indisputable that Dr. Hooda's May, 2010 decision to resign was in no way connected to either the Incident itself, or the desire to avoid any investigation thereof.

### 1.      *Legislative History of HCQIA*

The legislative history accompanying the 1986 enactment of HCQIA makes explicitly clear that the sole purpose of § 11133(a)(1)(B) is to prevent hospitals from cutting deals with physicians to either a) prevent of the *initiation* of an investigation, or b) to halt an *ongoing* investigation.  See Report 99-903 from the House Committee On Energy and Commerce ("House Report").  A true and correct copy of such House Report is attached hereto as Exhibit 2.

At page 3, the House Report notes that "hospitals too often accept 'voluntary' resignations of incompetent doctors in return for the hospital's silence about the reasons for the resignations. Hospitals make these agreements to avoid lengthy and unpredictable litigation.

Again at page 15, the House Report further states: "The purpose of requiring reports even for circumstances in which physicians surrender their privileges is to ensure that health care entities will not resort to 'plea bargains' in which a physician agrees to such a surrender in return for the health care entity's promise not to inform other health care entities about the circumstances of the physician's surrender of privileges."  Because Dr. Hooda's resignation was submitted and accepted long before the Incident occurred, it is clear that it does not fall into the category of ***post-misbehavior*** resignations that § 11133(a)(1)(B) was meant to address.

### 2.    *Case Law Interpreting HCQIA*

Likewise, turning from legislative history to case law, numerous courts have expressly stated that the purpose of § 11133(a)(1)(B) is to "prevent physicians from circumventing the reporting requirement by resigning in anticipation of an adverse professional review."  See *Brown v. Medical College Of Ohio*, 79 F. Supp.2d 840, 842 (N.D. Ohio 1999)(involving facts highly similar to our own); and *Omar v. Jewish Hosp. Healthcare Services*, 153 SW3d 845, 847 (Ky. App. 2004).  See also *Wheeler v. Methodist Hospital*, 95 SW3d 628, 647 (Tex. App. – Houston [1st Dist.] 2002, no pet.), which interprets an identically-worded Texas statute as requiring "reporting resignations that **are tendered at the moment of inception of an investigation.**" (emphasis added).  It is to be noted that in all these cases, it is the physician's resignation which is deemed to be the relevant "surrender of clinical privileges."  Moreover, Defendants have not cited, nor has Dr. Hooda's own investigation turned up, any contrary case law granting § 11137(c) immunity to NPDB reports concerning physicians who resigned **before**

either i) the investigation itself commenced, or ii) before the precipitating incident or behavior occurred.  In sum, then, Defendants here seek to extend  § 11137(c) immunity far beyond its intended purpose, i.e. as a limited-purpose safety measure to catch those physicians who might collude with hospitals to evade professional review, because Dr. Hooda's resignation was offered and accepted long before any investigation commenced.  Dr. Hooda would further note that pre-investigation resignations such as his would in no way *eliminate* a health care entity's immunity for reviewing and reporting any alleged post-resignation wrongdoing, but would instead merely require that in doing so, the entity comply with the greater safeguards established for "professional review action immunity" under § 11112(a).

### 3.    NPDB Guidebook

Finally, although Defendants attempt to cite page F-8 of HHS's NPDB Guidebook in their favor ("The reason a practitioner gives for leaving an entity while under investigation is irrelevant to reportability of the resignation."), a closer look at the Guidebook shows that it in fact squarely backs Dr. Hooda's position that where a resignation is accepted before an investigation, any NPDB report is not entitled to immunity.  (www.npdb-hipdb.hrsa.gov/resources/NPDBGuidebook.pdf).  See the following quotations from the NPDB Guidebook:

> **Page E-19:**    A health care entity that submits an AAR based on surrender or restriction of a physician's or dentist's privileges while under investigation should have contemporaneous evidence of an ongoing investigation at the time of surrender, or evidence of a plea bargain.  The reporting entity should be able to produce evidence that an investigation was initiated **prior** to the surrender of clinical privileges by a practitioner. (Emphasis in original).

> **Page E-23**:    Example 8: A physician surrenders medical staff privileges due to personal reasons, infirmity, or retirement. *The surrender is not reportable.  The reasons for surrender are irrelevant unless the physician surrenders while under an investigation by a health care entity relating to possible professional*

*incompetence or improper professional conduct, or in return for not conducting*
*such an investigation.*

### 4.      Defendants Have Not Claimed Post-Incident "Acceptance" of Surrender

Dr. Hooda would also note that the language of § 11133(a)(B) requires that, for immunity

to be applicable, WCA must "**accept** the surrender" while the investigation is ongoing.  Here,

Defendants' own SOMF #12 stipulates that WCA "accepted Plaintiff's resignation" on May 11,

2010, or nearly a month before the June 7th meeting of the OB/GYN Care Evaluation Committee.

Assuming that Defendants contend that they are somehow not bound by their express May 11,

2010 acceptance, a successful claim of immunity will require that they show at trial a date upon

which they *did* provide the requisite acceptance of Dr. Hooda's departure.

However, neither Defendants' Motion nor their Statement Of Material Facts supplies

evidence of any such post-June "acceptance" date.   Indeed, Defendants' own SOMF #30

describes Dr. Hooda's June 11 e-mail – in which he discussed such conclusory housekeeping

matters such as returning his hospital ID and pager, completing patient charts, etc. – as merely

"accelerating" Dr. Hooda's prior May resignation.  See Defendants' Appendix M.

Finally, Dr. Hooda would show note that although § 11137(c) "report immunity" can

apply to other types of reports filed by health care entities under § 11133(a), Defendants have

failed to argue or supply any evidence that the NPDB Report filed by them qualifies for

immunity under any other provision of § 11133(a) beyond that concerning physician

resignations.

In sum, then, summary judgment should be denied as to Defendants' assertion of "report

immunity" under § 11137(c), because Dr. Hooda has shown that such "report immunity" was not

designed to address resignations occurring **before** either an investigation or the triggering

conduct.   In the alternative, summary judgment should be denied because Dr. Hooda has

supplied sufficient evidence to create an issue of material fact as to whether WCA's requisite "acceptance" of Dr. Hooda's resignation predated their alleged June 7 commencement of their investigation.

**B.      Professional Review Action is Unavailable to Defendants**

*1.      Applicable Standards*

After devoting 11 pages to their "report immunity" argument, Defendants also slap on a ramshackle 1.5 pages claiming they are also entitled to "professional review action immunity" under § 11111(a)(1).  As indicated by the paltry effort dedicated to it, this second argument is doomed from the start, because to qualify for § 11111(a)(1) immunity, Defendants must first comply with the four requirements set out at § 11112.

Among these four requirements is § 11112(a) (3)'s mandate that the professional review action must be taken "**after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances**."  In other words, no adequate notice and hearing, no immunity.  *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992); *Hussein v. Duncan Regional Hospital*, 2009 U.S. Dist. LEXIS 38320 *9 (W.D. Okla. 2009); and *Chudacoff v. United Medical Center*, 609 F. Supp.2d 1163, 1176-77 ( D. Nev. 2009).

In § 11112's succeeding subsection (b), there are set out safe harbor guidelines which, if complied with, are deemed to satisfy § 11112(a)(3) adequate notice and hearing requirement ("Safe Harbor Guidelines").  Such Safe Harbor Guidelines require:

(1)      Notice of proposed action.  The physician has been given notice stating –

(A)(i) that a professional review action has been proposed to be taken against the physician,
(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

Section 11112(b) concludes by stating that a professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3).

### 2.   *Satisfaction of Safe Harbor Requirements*

Defendants allege they began their investigation of Dr. Hooda on June 7th, , 2010, at a meeting of WCA's OB/GYN Care Evaluation Committee.  See SOMF #25-27.  Defendants make no allegation that Dr. Hooda was informed of this June 7th meeting, and Dr. Hooda has supplied affidavit testimony denying any knowledge thereof.  Defendants also allege that their resulting professional review was begun on June 30, 2010 by WCA's Pediatric Care Evaluation Committee, and completed on July 13.  See pp. 8-10 of Defendants' Motion, SOMF #35-40, and Defendants' Appendix R and S.

Between the alleged June 7th initiation of Defendants' professional review and its July 13th conclusion, Defendants themselves claim to have provided only one relevant **written** communication to Dr. Hooda, a June 14th e-mail composed by Dr. Marlene Garone ("Garone").  See Defendants' Appendix P.  A cursory review will indicate that this e-mail complies with none of § 11112(b)(1)'s Safe Harbor Requirements as to notice.  Defendants' Motion also seeks to make much of two other communications supposedly sent to Dr. Hooda, a July 13th letter sent by Dr. Virginia Campion ("Campion") (Defendants' Appendix S), and a July 22 letter sent by Defendant Wright (Defendants' Appendix T).  Unfortunately for Defendants, these letters were both sent after Defendants claim to have completed their professional review on July 13, and so

can hardly provide proper notice of an action which had already occurred.  See *Chudacoff*, 609 F. Supp.2d at 1177, expressly holding that immunity becomes unavailable where notice is provided **after** a hospital has completed its review action, and emphasizing that § 11112(b)(1) refers to "notice of PROPOSED actions," not already-completed ones.  Moreover, it is again obvious from the face of the July 13th and July 22nd letters that such do not come close to complying with § 11112(b)(1)'s Safe Harbor Requirements as to notice.

Thus, by failing to comply with these Safe Harbor Requirements as to notice, Defendants cannot be deemed to have met § 11112(a)(3)'s notice requirements.

### 3. *Provision of "Other Procedures as are Fair Under the Circumstances"*

As noted above, however, Section 11112(b) provides that a professional review body's failure to meet the Safe Harbor Requirements does not, **in itself**, constitute failure to meet the subsection (a)(3) notice requirement.  Correspondingly, § 11112(a)(3) allows immunity to attach to professional review actions taken "after such other procedures as are fair to the physician under the circumstances."

Thus, we next explore if Defendants somehow provided adequate notice to Dr. Hooda outside of the Safe Harbor Requirements.  In applying this alternate, "other fair procedures" standard, federal courts have required compliance to be "so close to the 'safe harbor' that no reasonable jury could find [that the plaintiff physician] rebutted the presumption that the procedures were adequate.  *Smith v. Ricks*, 31 F.3d 1478, 1487 (9th Cir. 1994).  Accordingly, courts have tolerated only trivial deviations from the Safe Harbor Requirements.  Compare *Osuagwu v. Gila Regional Medical Center*, 2010 U.S. Dist. LEXIS 43225 *62-63 (D. N. Mex. 2012)(denying "professional review action immunity"  where hospital deviated from only *some* Safe Harbor Requirements), with the extensive procedural protections provided in those cases

found to have satisfied the alternate, "other fair procedures" standard.  These cases include *Mathews v. Lancaster General Hospital*, 883 F. Supp. 1016, 1033-34 (E.D. Pa. 1995); *Monroe v. AMI Hospitals Of Texas, Inc.*, 877 F. Supp. 1022, 1029-30 (S.D. Tex. 1994), and – in the only case our research turned up from among the district courts of the 2nd Circuit – *Kunajukr v. Lawrence & Memorial Hospital*, 2009 U.S. Dist. LEXIS 129545 *44-46 (D. Conn.).

### a.    *Garone's E-Mail*

We now apply this alternate, "other fair procedures" standard to the facts of our own case.  We start first with the only ***written*** document sent by Defendants ***prior*** to completing their professional review action on July 13, 2010, i.e. the June 14th e-mail composed by Garone.  See Defendants' Exhibit P.  The Court's review will show that the June14th Garone e-mail does not state that any action has been proposed to be taken **against Dr. Hooda**, nor does it make any specific mention of alleged misbehavior **by Dr. Hooda** in regards to the Incident.  Indeed, its opening line expressly refers to an earlier June 3rd Whistleblower E-mail from Hooda extensively reporting Incident-related misbehavior ***by WCA itself and other physicians practicing there.*** Moreover, as shown by Defendants' Exhibit P, Garone's June 14th e-mail was drafted in direct response to Hooda's Whistleblower E-mail, as shown by the fact that Hooda's e-mail is attached as a "thread" thereto.

Thus, after complaining to Garone about the Incident-related misbehavior ***of others***, and being vaguely informed by her that the Incident had been referred for quality review, Garone's e-mail could be reasonably interpreted as indicating that the "quality review" referred to therein involved the complained-of misbehavior of others, and not that of Dr. Hooda.  Dr. Hooda would also note that Garone's June 14th e-mail twice refers to the  June 7th quality review as an ***already-completed*** process, not an ***ongoing*** one.  Such e-mail states in the first paragraph that "**the**

**review was completed and discussed in Committee on Monday June 7th**," (emphasis added). Again, in the second paragraph, Garone urges Dr. Hooda (who had already left for Texas) to physically meet with her, stating that "[t]his is not a request but a requirement **following the quality review**" (emphasis added).

Thus, Garone's June 14th e-mail gives no indication that any *further* professional review procedures are anticipated.  Although Garone does request that Dr. Hooda meet with her concerning the June 7th meeting, it is certainly a reasonable interpretation that any such meeting would merely serve to update the whistleblowing Dr. Hooda, "following the quality review," as to its outcome regarding the Incident-related concerns that Hooda himself had raised concerning others.  See especially the Garone E-Mail's opening line: "The case you referenced in your note below was referred for quality review…"

In short then, the June 14th Garone e-mail comes nowhere close to approximating the Safe Harbor Requirements, in that i) it gives no warning of any *proposed* (i.e. future) action, as opposed to an already-completed one, ii) it does not indicate that such action is to be taken *against Dr. Hooda*, iii) it does not specify the *reasons* for any proposed action against Hooda, iv) it does not notify Dr. Hooda of his rights to request a hearing, and v) it does not inform of his procedural rights at such a hearing.  At best, Garone's E-Mail requests that Dr. Hooda, already departed for Texas with his family, return to Jamestown to hold an informal meeting with a single hospital employee, rather than a professional body entitled to conduct reviews.  See 42 USC § 11151(9), (11).

### b.      *Letters Allegedly Sent to Dr. Hooda in July*

As already discussed above in the Safe Harbor section, Defendants also attempted to send two other letters to Dr. Hooda, a July 13th letter sent by Campion (Defendants' Appendix S), and

a July 22 letter sent by Defendant Wright (Defendants' Appendix T) ("July Letters").  Dr. Hooda

has submitted testimony that he never received either such letter, and Defendants admit that the

July 22 letter was returned as undeliverable.  SOMF #44.  Even if they had been received by Dr.

Hooda, neither letter comes close to satisfying the Safe Harbor Requirements because they make

no mention of Dr. Hooda's right to request a hearing, nor the other rights applicable to such a

hearing.  Far more importantly, however, both July letters were issued **after** WCA had fully

completed its professional review on July 13, and so can hardly provide proper notice of an

action which had already occurred.     See pp. 8-10 of Defendants' Motion, SOMF #35-40, and

especially Defendants' Appendix R, which clearly shows that the final decision to reprimand Dr.

Hooda and to report his alleged Incident-related misconduct were made on July 13, 2010.

As noted above in *Chudacoff* decision, 609 F. Supp.2d at 1177, notice given ***after***

sanctions are imposed is essentially no notice at all:

> Most important for present purposes is that the statute requires that the "physician has been given notice stating that a professional review action has been proposed to be taken against the physician."

> The timing of the notice is critical to understanding this provision.  The first phrase – that the physician "has been given notice" – indicates that the health care entity has informed the physician of a review action.  This phrase expresses that the giving of the notice occurred in the past ("has been given").

> The second part of the phrase – that a "review action has been proposed to be taken" – signifies that the review action has not yet come to fruition.  While the review action has "been proposed," it has not already "been taken."  Instead, the "proposed action" is still "to be" taken.  That is, it will occur, if at all, in the future.

> Were it sufficient for the defendants merely to give plaintiff notice of the review action after the fact, the statute would read as follows: "The physician has been given notice stating that a professional review action has been taken against the physician."  This variation omits the operative phrase "proposed to be," which clearly denotes when in the course of events the review action must take place.

For these reasons, Defendants' July Letters likewise fail to satisfy § 11112(a)(3)'s alternate, "other procedures" standard.

### c.    *Alleged Telephone Calls to Dr. Hooda*

Finally, Defendants allege that they made various telephone calls to Dr. Hooda regarding their professional review of the Incident. See Defendants' SOMF #28, 29 and 32.  In SOMF #28, Defendants assert that Garone contacted Dr. Hooda's employer STP on July 7, 2010, and left a message for Dr. Hooda, and refers to Garone's deposition Exhibit KK.  However, neither the cited SOMFs nor Garone's Affidavit give any indication that such phone message provided Hooda with any information whatever that an investigation had been initiated.

Again, at SOMF #29, Defendants claim – without more – that a WCA employee called Dr. Hooda's employer STP three times in June of 2010, and substantiates this with their Appendix L, a phone bill indicating what calls were made, but which gives no indication of the calls' purpose, intended recipient, whether any message was left, and whether any such message provided Hooda with any information whatever that an investigation had been initiated against him.

Last, page 8 of Defendants' Motion and SOMF #32 both allege that Defendant Wright contacted Dr. Hooda by phone on June 11 about **a** quality review (but not one targeting him). Defendants attempt to substantiate this by citing to Wright's Affidavit at Appendix JJ, as well as Attachments 9 and 10 to Exhibit EE.  We would begin by noting that Dr.Hooda has submitted affidavit testimony stating that although he spoke with Defendant Wright that day, she made no mention whatever of an investigation (much less one **concerning him**), nor did he agree to a followup meeting on June 14.

Even assuming *arguendo* that Wright did mention an investigation during the June 11 call, precious little supports Defendants' apparent insinuation that Wright further informed Hooda that such investigation was targeted at him.  Interestingly, Defendants' own exhibits tell two significantly different stories regarding this matter.  As discussed above, Dr. Hooda had submitted a June 3rd Whistleblower E-mail to Wright complaining of the behavior of WCA and others regarding the Incident.  This becomes relevant because Defendants seek to bolster their SOMF #32 with an undated file memo ("File Memo") Wright attached to her August 11$^{th,}$ 2011 letter to the NPDB (Exhibit 10 of Appendix EE).  In that File Memo, Wright claims that during their June 11 phone call, she merely told Dr. Hooda that he should meet with Garone because "he had a case under quality review."  Wright then states that Dr. Hooda "told me that he had sent me an e-mail regarding the case he thought I must be referring to."

One year later, however, in her affidavit executed in June of 2012 (Appendix JJ) Wright has now changed her story.  Although the 2012 Affidavit otherwise closely tracks the language of the 2011 File Memo, Wright has altered her claim that she told Dr. Hooda that "he had **a case** under quality review," to read instead that she told him that "**he** was under quality review."  See ¶5 of Exhibit JJ.  More interestingly still, Wright's Affidavit again asserts that Dr. Hooda suggested to her that his Whistleblower Memo – complaining of Incident-related wrongdoing by others – should sufficiently set forth his input regarding the Incident.

Thus, as to all of the telephone calls made by Defendants to Dr. Hooda, only the June 11, 2010 call by Wright possesses sufficient substance to even *conceivably* satisfy § 11112(a)(3)'s alternate, "other fair procedures" standard as to notice.  As noted above, Dr. Hooda has submitted affidavit evidence denying that Wright ever informed him that an investigation had been begun against him, and Wright's **own** written statements contradict each other in this

regard.  Further, Wright's own admission – that Dr. Hooda believed that her phone call involved his Whistleblower E-Mail concerning **wrongdoing by others** – strongly suggests that Wright failed to provide effective notice of any charges **against Hooda.**   In light of such factual uncertainty, the Court is reminded that in the summary judgment context, the Court must "resolve all ambiguities and draw all factual inferences" in Dr. Hooda's favor.  *Cronin v. Aetna Life*, 46 F.3d 196, 202 (2nd Cir. 1995).

Finally, even beyond these disputed matters, it remains clear that Wright's call failed to comply with the 11112(b)(1) Safe Harbor Requirements, in that i) her "notice" was not in writing; ii) she did not inform Dr. Hooda of his right to a hearing; and iii) she did not provide him with a summary of his rights at such hearing.   Recollecting that federal courts treat § 11112(a)(3)'s alternate, "other fair procedures" standard as being met only where the health care entity has **closely** approximated the protections provided for under the Safe Harbor Requirements, it is a clear that Dr. Hooda has shown that – at minimum – a question of fact exists as to whether Defendants' terminally vague phone calls and e-mails came sufficiently close to satisfy such Safe Harbor Requirements. *Smith*, 31 F.3d at 1487; *Osuagwu*, 2010 U.S. Dist. LEXIS 43225 at *62-63; and *Peyton v. Johnson City Medical Center*, 101 SW3d 76, 86 (Tenn. App. 2002).

### 4.   *No Waiver by Dr. Hooda*

Having failed to prove compliance with either § 11112(b)(1)'s   Safe Harbor Requirements or § 11112(a)(3)'s "other fair procedures" exception, the only remaining path available for Defendants to claim  "professional review action immunity" under § 11111(a)(1) is a showing that Dr. Hooda's right to such Safe Harbor protections was "voluntarily waived" by him, pursuant to § 11112(b).

However, under federal, New York and Texas law alike, the applicable standard is identical: waiver is the voluntary relinquishment of a **known** right, and will not be lightly presumed.  *HECI Exploration v. Holloway*, 862 F.2d 513, 523 (5th Cir. 1988);  *LTA Group, Inc. v. J.B. Hunt*, 101 F. Supp.2d 93, 103 (NDNY 2000); *Chapman v. Choicecare*, 2002 U.S. App. LEXIS 24460 *10 (2nd Cir. 2002);  *Gallegos v. Top RX*, 2008 US Dist. LEXIS 119433 *37-39 (WDNY 2008) ("The intent to waive must be unmistakably manifested, and is not to be inferred from a doubtful act.")

Accordingly, for Dr. Hooda to have *knowingly* waived the rights provided for under the Safe Harbor Requirements, he must have first been given *notice* of what those rights consisted of.  *JEM, Inc. v. Seneca Ins.*, 309 Fed. Appx. 491, 492 (2nd Cir. 2009).  Dr. Hooda has shown that Defendants never fulfilled their statutory duty to make him aware of his rights with respect to their alleged professional review, and indeed the evidence is highly shaky as to whether Defendants adequately informed Dr. Hooda of the existence of any future professional review – targeted at him – in which he might need to exercise such rights.

## C.    Plaintiff's Demand For Preliminary Injunction Must be Upheld

At pp. 21-23 of their Motion, Defendants likewise seek summary judgment as to Dr. Hooda's motion for a preliminary injunction, on numerous invalid grounds.  As to Dr. Hooda's ability to succeed on the merits of its claims, the above Response fairly illustrates Defendants' inability to hide behind HCQIA immunity.  As to the irreparable harm Dr. Hooda is to suffer from Defendants' improper NPDB Report, the Court is directed to ¶¶81-88, 96-98 of the Hooda Affidavit, which detail Dr. Hooda's likely loss of his position at UTMB, as a result of such improper Report.

As to Defendants' claim that the HCQIA does not provide for a private right of action, Dr. Hooda would note that he has not sued Defendants under such statute.  Finally, as to Defendants' noises about the balancing-of-equities here, Dr. Hooda would note the undeniable fact that very shortly **after** he filed his Whistleblower E-Mail complaining of Defendants' practices, Defendants suddenly took great interest in disciplining an already-resigned physician. While the NPDB's immunity provisions may have been enacted with the most laudable of intentions, more than one commentator has noted that such immunity inadvertently gives hospitals a near-absolute "free pass" to slander whistleblowers, as our own case shows.  See Van Tassel,  Blacklisted: The Constitutionality Of The Federal System For Publishing Reports Of "Bad Doctors" in the National Practitioner Data Bank, 33 Cardozo L. Rev. 2031, 2056, 2077, 2090 (2012); Erwin, Analyzing The Disruptive Physician: How State And Federal Courts Should Handle Whistleblower Cases Brought By Disruptive Physicians, 44 Duq. L. Rev. 275, 277-279 (2006).

**D.     Defendants Are Not Entitled to Attorney's Fees**

Finally, Defendants seek attorneys and costs under federal (42 USC § 11113) and state (Tex. Occupations Code § 160.008) law.  Unfortunately for Defendants, § 11113 clearly requires that they first meet the standards set out at § 11112(a), which include providing adequate notice. Because Dr. Hooda has shown above that Defendants did not meet this burden, no attorneys fees are available.

As to the TEXAS OCCUPATIONS CODE, recovery of fees is dependent on a showing that Dr. Hooda's action was "frivolous or brought in bad faith."  The arguments set forth above clearly refute any such notion.

**CONCLUSION**

As evidenced above, Plaintiff has methodically deflated all of the summary judgment arguments advanced by Defendants.  Accordingly, Plaintiff hereby requests that Defendants' Motion be denied in its entirety; and that Plaintiff be granted all other relief to which it may be entitled, at law or in equity.

Dated: July 30, 2012

Respectfully Submitted,

**HUGHES ELLZEY, LLP**

_/s/ William Craft Hughes_
William Craft Hughes, Esq.
_Attorney-In-Charge_
HUGHES ELLZEY, LLP
2700 Post Oak Blvd., Suite 1120
Houston, TX 77056
Phone (888) 350-3931
Fax (888) 995-3335
E-Mail: craft@crafthugheslaw.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 5 of the FEDERAL RULES OF CIVIL PROCEDURE, I hereby certify that on the 30th day of July, 2012 I electronically filed the above and foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following parties and counsel of record:

Stephen A. Manuele
FELDMAN KIEFER, LLP
The Dun Building
110 Pearl Street, Suite 400
Buffalo, New York 14202
Phone (716) 852-5875
Fax (716) 852-4253
***Attorney for Defendants,***
***W.C.A. Service Corporation d/b/a***
***WCA Hospital and Betsey Wright***


_____*/s/ W. Craft Hughes*_____
W. Craft Hughes