## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BARKAT S. HOODA, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CA No. |
| | § | |
| W.C.A. SERVICES CORPORATION | § | |
| d/b/a WCA HOSPITAL, | § | |
| BETSY T. WRIGHT, | § | |
| TARIQ M. KHAN, M.D., and | § | |
| ROBERT L. DANIELS, M.D. | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF BARKAT S. HOODA, M.D.

**STATE OF TEXAS**    §
                        §
**HARRIS COUNTY**    §

Before me, the undersigned notary, on this day personally appeared BARKAT S. HOODA, M.D., the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1. "My name is Barkat S. Hooda. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. The facts stated in this affidavit relate to matters and incidents that I personally witnessed during and after my employment with Southern Tier Pediatrics and through my staff privileges with WCA Hospital ("WCA").

3. I have been practicing medicine in the United States since 1993 and as a Pediatrician since 1996.

4. I received my medical degree in Pakistan and completed my residency in the Department of Pediatrics at the University of Florida in 1996.

5. I then completed a three-year fellowship at Brown University in Pediatric Hematology Oncology in 1999.

6. Thereafter, I became a fellow in Pediatric Neuro-Oncology at New York University.

7. I was Dual American Board Certified in General Pediatrics & Pediatric Hematology Oncology prior to starting work with Southern Tier Pediatrics in Jamestown, New York as a General Pediatrician.

8. I was employed by Southern Tier Pediatrics in Jamestown, New York as a General Pediatrician from October 01, 2009, until I formally resigned on or about May 3, 2010.

9. Throughout my employment with Southern Tier Pediatrics, I was an Associate Member of the WCA Hospital Medical Staff having Active Clinical Privileges in the Department of General Pediatrics with full Admitting Privileges for patients seen in the clinics. Neither, I have a valid Neonatal Advance Life Support (NALS) certification nor Southern Tier Pediatrics and/or WCA hired me as a Neonatologist at any time, before or during, my short stay in Jamestown, NY.

10. I am highly trained in General Pediatrics; however, delivery and resuscitation of babies, especially high-risk newborns requiring intubations and other advance procedures, are generally performed by NALS certified neonatology trained Pediatric Physicians as a standard of care.

11.    I am trained to care for the malignant and non malignant diseases of infancy and childhood from birth onwards. As such, I have knowledge about the staffing and infrastructure that is standard for proper care of newborns, high-risk or not.

12.    I resigned from my position with Southern Tier Pediatrics after a rather short stay because I felt that its affiliated WCA hospital's practice of delivering extremely premature infants and super high-risk full-term infants was unethical and against the best interest of those babies.

13.    Specifically, the Neonatal Intensive Care Unit ("NICU") and Neonatologists were not available on site; and while WCA did have a Level I Nursery; it was not sufficiently equipped with the proper infrastructure, neonatologist personnel, and appropriately trained and NALS certified support staff competent in performing neonatal CPR.

14.    During the time I worked at Southern Tier Pediatrics, WCA Hospital and some of their Obstetricians demonstrated a pattern of opting to deliver and care for premature/high-risk infants in house rather than promptly referring or transferring them to the appropriate tertiary hospital or facility.

15.    I believed WCA's practices were wrong and would jeopardize the care provided in their Nursery to high risk newborns and premature babies with suboptimal resources and that was the major reason of my resignation.

16.    After giving notice of my resignation, I continued my contractually mandated duties in General Pediatrics with Southern Tier Pediatrics

17.    During this time, I had some additional unpleasant experiences that ultimately compelled me to notify hospital management.

18.     For example, I was assigned new patients despite WCA's clear understanding that I had resigned, would leave for good in June 2010.

19.     Assigning a new patient to a physician who will not be available to the patient for the full and long term of care, is against the best interest of the child patient from a continuity of care standpoint.

20.     This troubled me, just as the substandard care I witnessed while working at WCA had.

21.     On the afternoon of June 2, 2010, I was attending to my usual duties for Southern Tier Pediatrics when the WCA operator and NICU nurse called me to assist with the delivery of a very premature baby in the OR.

22.     The callers did not provide any further details; however, it was clear from the nature of the call that intubation would likely be necessary following the delivery.

23.     I proceeded to the OR at WCA just before 1:00 PM.

24.     Upon arriving, I went straight to the VP Administrator and notified him of the extremely high-risk premature delivery in the OR, and requested his assistance in getting qualified personnel for the intubation procedure.

25.     While WCA hospital called me to attend the delivery of a highly premature baby that would require intubation, I did not have privileges to perform the intubation.

26.     I entered the mother's room at approximately 1:05 PM and personally took the mother's history and spoke to the father.

27.     Also present in the room were Dr. Robert Daniels, the attending WCA staff OBGYN, and Dr. Tariq M. Khan, my superior at Southern Tier Pediatrics.

28.     For the first time, I learned that the gestation of the young mother was twenty-two weeks; she had a prolonged rupture of the membrane for more than seven days while under care of Dr Daniels; and the mother's vaginal swab was positive for Group B Strep.

29.     This was an extremely high-risk delivery, one for which I believed WCA was ill equipped.

30.     I had asked Dr. Daniels to transfer the case to a proper facility, but Dr. Daniels refused.

31.     The doctors clearly indicated to the parents that the baby's chances for survival were extremely poor.

32.     Dr. Daniels then initiated delivery procedures.

33.     I documented the pre-delivery encounter with the parents in the "Mother's Chart" between 1:12 PM and 1:16 PM.

34.     The baby was delivered still at 1:16 PM and taken to the OR from the mother's room.

35.     Dr. Khan attempted intubation three separate times without success while CPR was being administered.

36.     I did not hear any heart beat at any time during post-delivery through umbilical cord palpation or auscultation.

37.     The team abandoned CPR at approximately 1:30 PM after failing to revive the baby after three rounds of drug administration.

38.     Dr. Khan and I returned to the mother's room, where we informed the mother that the baby could not be revived.

39.     I wrote a post-delivery note in the mother's chart around 1:32 PM.

40.     I noted that I was not properly notified before the delivery because I did not learn the true nature of the mother's and child's condition until I arrived in the mother's room just minutes before the birth.

41.     I also wrote that the WCA was not a suitable facility for the delivery of a high-risk child like this one, and that Dr. Daniels should have transferred this case to a suitable facility once it became established that mother had a prolonged rupture of membranes (over 18 hours). Instead Dr Daniels continued to keep the patient under his care for over a week. My request to transfer the delivery was also refused by Dr Daniels and his staff.

42.     Dr. Khan then asked me to return to the Southern Tier Pediatric clinic to clear the backlog of patients while he stayed back at WCA.

43.     Dr. Khan entered my room at the clinic at approximately around 2:15 PM and berated me for the two separate notes I had written in the mother's chart before and after delivery.

44.     Dr. Khan used a four-letter word and told me that Dr. Daniels was extremely upset with my documentation of the mother's maternal history.

45.     Dr. Khan said Dr. Daniels would be calling any time to straighten me out.

46.     Dr. Daniels called me the next day and berated me.

47.     Later that day at WCA, I noticed Dr. Daniels carrying the mother's chart as he was performing D&C/s on the mother who kept intermittently bleeding post delivery as per his own verbal report.

48.     On June 3, 2010, I found my hand written pre and post delivery notes lying in the WCA nursery (where no maternal records are kept/stored), and they were separated from the rest of the mother's entire chart.

49.     On June 3, 2010, approximately one week prior to my last day at WCA and Southern Tier Pediatrics, I sent an email to WCA President and Chief Executive Officer, Betsy T. Wright.

50.     In this email, I explained that I felt compelled to inform WCA management of the sort of substandard medical care the hospital was administering.

51.     I also explained that I had decided to resign because of WCA's practices, and that the previous day's events represented a perfect example of the unethical conduct that had driven me to look for another job some months earlier.

52.     On June 4, 2010, the day after I sent the email to Betsy T. Wright, Dr. Daniels called me and threatened me. He made direct threats such as, "you will pay for it soon."

53.     On June 11, 2010, Dr. Khan approached me in person and threatened me, saying, "you will surface somewhere in the United States. We will get you wherever you will be, and we have the means to do so."

54.     Also on June 11, 2010, WCA President and CEO, Betsy Wright, threatened me during a telephone conversation. She said, "We will finish your medical career in the United States."

55.     I worked my last day at Southern Tier Pediatrics on June 11, 2010.

56.     I moved to Texas on June 14, and passed the Texas Physician Jurisprudence Examination on June 28, 2010.

57.     Thereafter, I started working full time as an associate professor of Pediatric Hematology Oncology at University of Texas Medical Branch School of Medicine ("UTMB"), under a faculty temporary medical license (FTL).

58.     Per my new job requirements, I began the process of obtaining my permanent Texas medical license.

59.     I became the fully credentialed member of Medical Staff of UTMB on August 12, 2010

60.     No adverse reports about me were on file with the NPDB until that time to my knowledge.

61.     On August 26, 2010, WCA followed through on its threats by filing a false and disparaging report with the NPDB about me.

62.     The report WCA filed with the NPDB falsely stated that I had failed to answer the call to attend the June 2, 2010 delivery.

63.     The report further alleged that WCA launched an internal investigation of the matter and took action by terminating my privileges for my alleged failure to attend the delivery.

64.     At no time did WCA inform me on its letterhead that it was initiating an investigation, nor did it take any action against me while I was working at the hospital.

65.     Indeed, I had no knowledge of the NPDB report until my superiors at UTMB notified me in writing in September 2010.

66.     WCA's report to the NPDB is a complete fabrication.

67.     As I stated, I left WCA and Southern Tier Pediatrics on my own accord.

68.     I felt I could no longer work for health care providers who handled cases for which they were unequipped, and who chose financial interests over the interests of its patients.

69.     Therefore, I began to explore other employment opportunities.

70.     On March 1, 2010, I interviewed for the Associate Professor position at UTMB.

71.     I accepted UTMB's offer, in writing, on March 16, 2010, and the Dean of UTMB ratified the offer on April 27, 2010.

72.     Thus, I had accepted a new job and planned to leave WCA over next few weeks before my alleged failure to attend the delivery and WCA's alleged termination of my privileges.

73. My contract with Southern Tier Pediatrics had a clause allowing me to leave the practice anytime without giving any reason.

74. My alleged failure to assist with the delivery, in truth, had nothing to do with my departure from WCA, Southern Tier Pediatrics, or Jamestown. That irreversible decision had been made on March 16, 2010 when I got the job offer from UTMB.

75. Furthermore, WCA filed the report with the NPDB approximately two months after my alleged "no-show," and after I moved to Texas to begin my new job at UTMB.

76. Despite such blatant fabrications on the part of WCA, I have suffered, and will continue to suffer, damages as a result of the mere existence of the report on my record.

77. First, any health care provider or hospital can log on to the NPDB website and see that I have a negative report on my record, adversely affecting my employability and application for privileges.

78. Second, UTMB policy requires that I obtain full permanent Texas medical license.

79. My application for a Permanent Texas medical license will be denied as long as the report exists on my record.

80. This will ultimately result in my discharge from UTMB.

81. UTMB cannot bill for services I performed for them with a temporary faculty license.

82. I cannot continue to work at UTMB or anywhere else unless I get a permanent license.

83. I perceive WCA's action amounting to my Professional Assassination

84. I risk termination from my current position at UTMB if the report remains on my record and prevents me from qualifying for a full permanent medical license in Texas.

85. However, my superiors at UTMB agreed to contact WCA to investigate the allegations in the NPDB report, while I attempt to clear the matter.

86.     A teleconference was arranged with WCA management, UTMB, and me to discuss the allegations.

87.     At some point during the conversation, a WCA officer admitted that she had seen the mother's medical chart from the June 2, 2010 delivery and had seen my hand written notes in it and knew that I was present on that date to assist with the delivery.

88.     At the conclusion of that statement, and after a pregnant pause, WCA terminated the teleconference.

89.     This admission proves that WCA knowingly filed a false report with the NPDB against me."



**Affiant, BARKAT S. HOODA, M.D.**

Sworn to and subscribed before me by BARKAT S. HOODA, M.D. on the 15th day of December, 2010.

M. Perez
Notary Public
STATE OF TEXAS
My Comm. Exp. Sep. 02, 2012

Notary Public in and for the
State of Texas