# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BARKAT S. HOODA, M.D. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CA No. 4:10-CV-05022 |
| | § | |
| W.C.A. SERVICES CORPORATION | § | |
| d/b/a WCA HOSPITAL, | § | |
| BETSY T. WRIGHT, | § | |
| VIRGINIA B. CAMPION, M.D. | § | |
| TARIQ M. KHAN, M.D., and | § | |
| ROBERT L. DANIELS, M.D. | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF BARKAT S. HOODA, M.D.

STATE OF TEXAS     §
                   §
HARRIS COUNTY      §

Before me, the undersigned notary, on this day personally appeared BARKAT S. HOODA, M.D., the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1. "My name is Barkat S. Hooda. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2. The facts stated in this affidavit relate to matters and incidents that I personally witnessed during and after my employment with Southern Tier Pediatrics and through my staff privileges with WCA Hospital ("WCA").

3. I have been practicing medicine in the United States since 1993 and as a pediatrician since 1996.

4. I received my medical degree in Pakistan and completed my residency in the Department of Pediatrics at the University of Florida in 1996.

5. I then completed a three-year fellowship at Brown University in Pediatric Hematology Oncology in 1999.

6. Thereafter, I became a fellow in Neuro-Oncology at New York University.

7. I was dual American Board Certified in General Pediatrics and Pediatric Hematology Oncology prior to starting work with Southern Tier Pediatrics in Jamestown, New York as a general pediatrician.

8. I was employed by Southern Tier Pediatrics in Jamestown, New York as a General Pediatrician from October 2009, until I resigned on or about May 3, 2010.

9. Throughout my employment with Southern Tier Pediatrics, I was an Associate Member of the WCA Hospital Medical Staff, having active clinical privileges in the Department of General Pediatrics, with full admitting privileges for patients seen in the clinics. I do not have a Neonatal Advance Life Support (NALS) certification, nor did Southern Tier Pediatrics hire me as a Neonatologist.

10. I am highly trained in general pediatrics; however, delivery and resuscitation of babies, especially high-risk newborns requiring intubations and other advanced procedures, are generally performed by neonatology trained pediatric physicians.

11. I am trained to care for the malignant and non malignant diseases of infancy and childhood from birth onward. As such, I have knowledge about the staffing and infrastructure that is standard for proper care of newborns, high-risk or not.



12. I resigned from Southern Tier Pediatrics after a rather short stay because I felt that its affiliation with WCA's practice of delivering extremely premature infants and super high-risk full-term infants was unethical and against the best interest of those babies.

13. Specifically, the Neonatal Intensive Care Unit ("NICU") and neonatologists were not available on site; and while WCA did have a Level I Nursery, it was not sufficiently equipped with the proper infrastructure, neonatologist personnel, and appropriately trained and NALS certified support staff competent in neonatal CPR.

14. During the time I worked at Southern Tier Pediatrics, WCA and some of their Obstetricians demonstrated a pattern of opting to deliver and care for premature/high-risk infants in house rather than promptly referring or transferring them to the appropriate tertiary hospital or facility.

15. I believed WCA's practices were wrong and would jeopardize the care provided in their nursery to high risk newborns and premature babies with suboptimal resources, and that was the major reason of my resignation.

16. After giving notice of my resignation, I continued my contractually mandated duties with Southern Tier Pediatrics for the notice period of approximately four weeks.

17. During this time, I had some additional unpleasant experiences that ultimately compelled me to notify hospital management.

18. For example, I was assigned new patients despite WCA's clear understanding that I was leaving the hospital after the notice period of four weeks.

19. Assigning a physician who will not be available to the patient for the full and long term of care is not in the best interest of the child patient from a continuity of care standpoint.

20. This troubled me, just as the substandard care I witnessed while working at WCA.

21. On the afternoon of June 2, 2010, I was attending to my usual duties for Southern Tier Pediatrics when the WCA operator and NICU nurse called me to assist with the delivery of a very premature baby in the operating room ("OR").

22. The callers did not provide any further details; however, it was clear from the nature of the call that intubation would likely be necessary following the delivery.

23. I proceeded to the OR at WCA just before 1:00 PM.

24. Upon arriving, I went directly to the VP Administrator and notified him of the extremely high-risk premature delivery in the OR, and requested his assistance in getting qualified personnel for the intubation procedure.

25. Although WCA called me to attend the delivery of a highly premature baby that would require intubation, I did not have privileges to perform an intubation.

26. On June 2, 2010, I entered the mother's room at approximately 1:05 PM and personally documented the mother's history in her medical chart and spoke to the father.

27. Also present in the room were Dr. Robert Daniels, the attending WCA staff OBGYN, and Dr. Tariq M. Khan, my superior at Southern Tier Pediatrics.

28. For the first time, I learned that the gestation of the young mother was twenty-two weeks; she had a prolonged rupture of the membrane for more than seven days; and the mother's vaginal swab was positive for Group B Strep.

29. This was an extremely high-risk delivery, one for which I believe WCA was not properly equipped to handle or provide the required medical treatment.

30. I asked Dr. Daniels to transfer the procedure to a proper facility, but Dr. Daniels refused.

31. The doctors clearly indicated to the parents that the baby's chances for survival were extremely poor.



32. Dr. Daniels then initiated delivery procedures.

33. I documented the pre-delivery encounter with the parents by writing my notes in the "Mother's Chart" between 1:12 PM and 1:16 PM on June 2, 2010.

34. The baby was delivered still at 1:16 PM and taken to the OR from the mother's room.

35. Dr. Khan attempted intubation three separate times without success while CPR was being administered.

36. I did not hear any heart beat at any time during post-delivery through umbilical cord palpation or auscultation.

37. The team abandoned CPR at approximately 1:30 PM after failing to revive the baby via three rounds of drug administration.

38. Dr. Khan and I returned to the mother's room, where we informed the mother that the baby could not be revived.

39. I wrote a post-delivery note in the mother's chart around 1:32 PM on June 2, 2010.

40. My written entry in the mother's chart also noted that I was not properly notified before the delivery because I did not learn the true nature of the mother's condition and the child's condition until I arrived in the mother's room just minutes before the birth on June 2, 2010.

41. I also entered a written note in the mother's chart stating WCA was not a suitable facility for delivery of a high-risk child like this one, and that Dr. Daniels should have transferred this case to a suitable facility once it was established that the mother had a prolonged rupture of membranes (for over 18 hours). Instead, Dr. Daniels continued to keep the patient under his care for over a week. I also noted that Dr. Daniels and his staff refused my request to transfer.

42. Dr. Khan then asked me to return to the Southern Tier Pediatric clinic to clear the backlog of patients while he stayed back at WCA.



43. Dr. Khan entered my room at the clinic at approximately 2:15 PM and berated me for the two separate notes I had written in the mother's chart before and after delivery on June 2, 2010.

44. Dr. Khan used a four-letter word and told me that Dr. Daniels was extremely upset with my documentation of the mother's maternal history.

45. Dr. Khan said Dr. Daniels would be calling any time to straighten me out.

46. The next day, on June 3, 2010, Dr. Daniels called me and berated me.

47. Later that day at WCA, I noticed Dr. Daniels carrying the mother's chart as he was performing D&C/s on the mother, who had been bleeding intermittently post-delivery as per his own verbal report.

48. I subsequently found my hand-written pre and post-delivery notes lying in the WCA nursery (where no records are kept/stored), and they were separated from the rest of the mother's entire chart.

49. On June 3, 2010, approximately one week prior to my last day at WCA and Southern Tier Pediatrics, I sent an email to WCA President and Chief Executive Officer, Betsy T. Wright.

50. In this email, I explained that I felt compelled to inform WCA management of the sort of substandard medical care the hospital was administering.

51. I also explained that I had decided to resign because of WCA's practices, and that the previous day's events represented a perfect example of the unethical conduct that had driven me to look for another job some months earlier.

52. On June 4, 2010, the day after I sent the email to Betsy T. Wright, Dr. Daniels called me and threatened me. Dr. Daniels made direct threats to me such as, "you will pay for it soon."



53. On June 11, 2010, Dr. Khan approached me in person and threatened me, saying, "you will surface somewhere in the United States...we will get you wherever you will be, and we have the means to do so."

54. Also on June 11, 2010, WCA President and CEO, Betsy Wright, threatened me during a telephone conversation stating, "we will finish your medical career in the United States."

55. I resigned from Southern Tier Pediatrics on or about May 3, 2010, and gave notice to WCA of my resignation on May 11, 2010.

56. Dr. Virginia B. Campion, the departmental chair of pediatrics at WCA, read my resignation during a departmental meeting on May 11, 2010.

57. During this same departmental meeting, I told Dr. Campion and all in attendance that I was moving to Texas to become an Associate Professor of Pediatric Hematology Oncology at University of Texas.

58. I worked my last day at Southern Tier Pediatrics on June 11, 2010.

59. Also on June 11, 2010, I sent an email to WCA telling WCA I was leaving for Texas the following Monday.

60. I moved to Texas on June 14, and passed the Texas Physician Jurisprudence Examination on June 28, 2010.

61. Thereafter, I started working full time as an associate professor of Pediatric Hematology Oncology at University of Texas Medical Branch School of Medicine ("UTMB"), under a temporary faculty medical license.

62. Per my new job requirements, I began the process of obtaining my permanent Texas medical license.

63. To my knowledge, no adverse reports about me were on file with the NPDB at that time.



64. On August 26, 2010, WCA followed through on its threats by filing a false and disparaging report with the NPDB about me.

65. The report WCA filed with the NPDB falsely stated that I had failed to answer the call to attend the June 2, 2010 delivery.

66. The report further alleged that WCA launched an internal investigation of the matter and took action by terminating my privileges for my alleged failure to attend the delivery.

67. At no time did WCA inform me it was initiating an investigation, nor did it take any action against me while I was working at the hospital.

68. Indeed, I had no knowledge of the NPDB report until my superiors at UTMB notified me in writing in September 2010.

69. WCA's report to the NPDB is a complete fabrication.

70. As I stated, I left WCA and Southern Tier Pediatrics on my own accord.

71. I felt I could no longer work for health care providers such as WCA who handle cases for which they are unequipped, and who chose financial interests over the patients' best interest.

72. Therefore, I began to explore other employment opportunities.

73. Around January 2010, UTMB contacted me and requested an interview. I was very interested in the position.

74. On March 1, 2010, I interviewed for the associate professor position at UTMB and received an offer of employment.

75. I accepted UTMB's offer, in writing, on March 16, 2010, and the Dean of UTMB ratified the offer on April 27, 2010.

76. Thus, I accepted a new job and planned to leave WCA over ten weeks before my alleged failure to attend the delivery and WCA's alleged termination of my privileges.



77. My contract with Southern Tier Pediatrics had a clause allowing me to leave the practice anytime without giving any reason.

78. WCA's false allegation of my failure to assist with the delivery had nothing to do with my departure from WCA, Southern Tier Pediatrics, or Jamestown.

79. Furthermore, WCA filed the report with the NPDB approximately two months after my alleged "no-show," and <u>after</u> I moved to Texas to begin my new job at UTMB.

80. Despite such blatant fabrications on the part of WCA, I have suffered, and will continue to suffer, damages as a result of the mere existence of the report on my record.

81. First, any health care provider can log on to the NPDB website and see that I have a negative report on my record, adversely affecting my employability and application for privileges.

82. Second, UTMB policy requires that I obtain full permanent Texas medical license.

83. My application for a permanent Texas medical license will be denied as long as the report exists on my record.

84. This will ultimately result in my discharge from UTMB.

85. UTMB cannot bill for services I perform for them with a temporary faculty license.

86. Without a permanent license, I cannot continue to work a UTMB or obtain employment as a physician anywhere else.

87. I face imminent termination from my current employment at UTMB if the report remains on my record and prevents me from qualifying for a full permanent medical license in Texas.

88. However, my superiors at UTMB agreed to contact WCA to investigate the allegations in the NPDB report, while I attempt to clear the matter.



89. On or about September 29, 2010, a teleconference was arranged with WCA management, UTMB, and me to discuss WCA's allegations and report to the NPDB.

90. Dr. Virginia B. Campion represented WCA in the teleconference.

91. At some point during the conversation, Dr. Virginia B. Campion admitted that she read my written notes in the mother's medical chart from the June 2, 2010 delivery and acknowledged that I was present on that date to assist with the delivery.

92. My superior at UTMB was present to hear Dr. Virginia B. Campion's statement.

93. At the conclusion of that statement, and after a pregnant pause, WCA terminated the teleconference.

94. This admission proves that WCA knowingly filed a false report with the NPDB against me.

95. On or about February 2011, my superiors at UTMB inquired as to when I might be able to apply for my permanent Texas medical license. I told them I was hopeful that I would be able to apply in March 2011.

96. As of March 18, 2011, UTMB and I have an upcoming meeting, during which UTMB will ask me the status of my application. I feel pressured to get my Texas license as soon as possible, for both the sake of my patients and UTMB, who has been very supportive during this process.

97. Most importantly, if I cannot obtain my Texas license as a result of the NPDB report, the pediatric cancer patients at UTMB will suffer the greatest detrimental effect. If I lose charge of the pediatric oncology department, the entire department will be destabilized."



BSH 03/18/2011

_____
Affiant, BARKAT S. HOODA, M.D.

Sworn to and subscribed before me by BARKAT S. HOODA, M.D. on the 18th day of March, 2011.



MARY WHITBY
Notary Public, State of Texas
My Commission Expires
March 24, 2012

_____
Notary Public in and for the
State of Texas